# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

MARY BULL; JONAH ZERN, and all
others similarly situated; LAURA
TIMBROOK; LEIGH FLEMING; CHARLI
JOHNSON; MICKY MANGOSING;
ALEXIS BRONSON; MARCY CORNEAU;
LISA GIAMPAOLI,
          *Plaintiffs-Appellees,*

v.

CITY AND COUNTY OF SAN
FRANCISCO; SAN FRANCISCO COUNTY
SHERIFF'S DEPARTMENT; MICHAEL
HENNESSEY, Sheriff; SAN FRANCISCO
COUNTY SHERIFF'S DEPUTIES,
          *Defendants-Appellants.*

No. 05-17080

D.C. No.
CV-03-01840-CRB

MARY BULL; JONAH ZERN, and all
others similarly situated; LAURA
TIMBROOK; LEIGH FLEMING; CHARLI
JOHNSON; MICKY MANGOSING;
ALEXIS BRONSON; MARCY CORNEAU;
LISA GIAMPAOLI,
          *Plaintiffs-Appellees,*

v.

CITY AND COUNTY OF SAN
FRANCISCO; SAN FRANCISCO COUNTY
SHERIFF'S DEPARTMENT; MICHAEL
HENNESSEY, Sheriff; SAN FRANCISCO
COUNTY SHERIFF'S DEPUTIES,
          *Defendants-Appellants.*

No. 06-15566

D.C. No.
CV-03-01840-CRB/
EMC

OPINION

11471

Appeal from the United States District Court
for the Northern District of California
Charles R. Breyer, District Judge, Presiding

Argued and Submitted
November 6, 2007—San Francisco, California

Filed August 22, 2008

Before: Sidney R. Thomas, Richard C. Tallman, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Thomas;
Concurrence by Judge Ikuta;
Dissent by Judge Tallman

**COUNSEL**

Dennis J. Herrera, City Attorney; Joanne Hoeper, Chief Trial Attorney; and David B. Newdorf (argued) and Robert A. Bonta, City Attorneys, for the appellants.

Marke E. Merin and Cathleen A. Williams, Law Office of Mark E. Merin (argued); and Andrew Charles Schwartz (argued) and Thomas A. Seaton, Casper, Meadows, Schwartz & Cook, for the appellees.

**OPINION**

THOMAS, Circuit Judge:

In this interlocutory appeal, we consider whether a blanket policy of strip searching without reasonable suspicion of all individuals arrested and classified for housing in the general jail population violates the arrestees' clearly established constitutional rights. Under the circumstances presented by this case, we conclude that it does, and affirm the order of the district court denying qualified immunity in this § 1983 class action suit.

I

The San Francisco Sheriff's Department ("Department") oversees an urban jail system, consisting of six county jails, which books and processes tens of thousands of persons a year. All new arrestees are brought to County Jail No. 9 where they are booked and a determination is made as to whether the arrestee will be released or housed pending arraignment. County Jail No. 9 is a temporary detention facility and does not contain accommodations for extended stays. Thus, all detainees who are classified for housing are transferred to another one of San Francisco's jails within 24 hours.

San Francisco's jails have faced a continuing problem with smuggled contraband, including drugs and weapons. Searches within the general jail population have uncovered hundreds of items of contraband. Many items of contraband have been discovered during strip searches conducted on new arrestees at County Jail No. 9. Defendants produced evidence of 49 discoveries of drug-related contraband and six weapon discoveries between April 2000 and January 2004.

Until January 21 2004, San Francisco had a policy[1] of strip searching all arrestees entering County Jail No. 9 who fell into multiple particular categories.[2] The strip search involved

---

[1]San Francisco's new policy, which went into effect January 21, 2004 and currently remains in effect, is not at issue in this case.

[2]According to the San Francisco Sheriff's Department's Policy and Procedure manual, the following categories of arrestees were required to be strip searched at the time of booking:

- An arrestee charged with a crime involving drugs, weapons, or violence;

- An arrestee with a criminal history involving drugs, weapons, or violence within the preceding five years or multiple arrests within the last five years for drugs, weapons, or violence;

inspection of the naked body, including the arrestee's breasts, buttocks, and genitalia.

According to Defendants, the strip search policy was applied as follows: upon arrival at County Jail No. 9, all inmates who were deemed searchable based on their charge or criminal history were automatically strip searched. Other arrestees were generally not strip searched unless they were

- A person charged with a parole violation or booked with a state parole hold;

- A person charged with violation of probation;

- A person in custody on detainer from another jurisdiction;

- A person returned to custody from San Francisco County parole;

- A person returned to custody from residential placement programs;

- A person in custody of another agency, booked into jail for safe-keeping;

- A person booked on a U.S. Marshal hold;

- A person assigned a custody level and scheduled for custodial housing;

- A person delivered from another jail.

The manual also stipulated that any arrestee may be strip searched by the "arresting, transporting, or booking officer" when the officer "has a reasonable suspicion based on articulable facts that the person may possess contraband.

identified for placement in a safety cell,[3] or if the detainee would not be released within twenty-four hours and therefore would need to be housed in another jail facility. In other words, the Department followed a blanket policy of strip searching all individuals who were classified for housing in the general jail population, regardless of the crime for which they were charged.

On April 23, 2003, Mary Bull and a class of similarly-situated plaintiffs brought a § 1983 suit against Defendants alleging causes of action under the Fourth and Fourteenth Amendments of the U.S. Constitution, and several provisions of state law. In an order issued June 10, 2004, the district court granted Bull's motion to certify a class under Rule 23(b)(3). The class was defined as:

> All persons who, during the applicable period of limitations, and continuing to date, were arrested on *any* charge *not* involving weapons, controlled substances, or a charge of violence, and *not* involving a violation of parole or a violation of probation (where consent to search is a condition of such probation), *and* who were subjected to a blanket visual body cavity strip search by defendants before arraignment at a San Francisco County jail facility without any individualized reasonable suspicion that they were concealing contraband. This class also includes 1) all arrestees who were subjected to subsequent blanket strip search(es) before arraignment after the initial strip search, without any reasonable individualized suspicion that they had subsequently acquired and hidden contraband on their persons; and 2) all persons who, prior to arraignment, were subjected to blanket visual body cavity search(es) incident to

---

[3]Safety cells are single-occupant, padded cells used to house inmates who were considered a danger to themselves or others, to be behaving in a "bizarre" manner, or to be "gravely disabled."

placement in a "safety cell" at any of the San Francisco County jails.

The class was further limited by the district court's February 23, 2006 order, which held that San Francisco's policy of strip searching arrestees on the basis of their criminal history was lawful.[4] The persons in the class as it stands before this Court are thus all arrestees who were strip searched prior to arraignment solely because they were classified for housing in the general jail population prior to their arraignment.

The parties filed cross-motions for summary judgment. On September 22, 2005 the district court granted in part and denied in part both motions. In relevant part, the district court held that Sheriff Hennessey was not entitled to qualified immunity with respect to San Francisco's blanket policy of strip searching all individuals classified for housing in the general jail population. Defendants now appeal the district court's denial of qualified immunity for Sheriff Hennessey.[5]

## II

We review de novo a district court's decision to grant summary judgment on the ground of qualified immunity. *Motley v. Parks*, 383 F.3d 1058, 1062 (9th Cir. 2004). In reviewing

---

[4]Specifically, the court excluded arrestees with one or more prior convictions or two or more prior arrests for crimes involving drugs, weapons or violence within the prior five years.

[5]On October 21, 2006 Defendants moved for reconsideration of portions of the district court's August 30, 2005 Order that were unrelated to the court's denial of qualified immunity for the Sheriff. Defendants simultaneously appealed the denial of qualified immunity to this Court. This appeal was assigned Docket No. 05-17080. On February 23, 2006 the district court issued an Amended Memorandum and Order Re: Motions for Summary Judgment. Defendants again appealed the denial of qualified immunity to this Court. This second appeal was assigned Docket No. 06-15566. On April 26, 2006, this Court issued an Order consolidating appeals No. 05-17080 and 06-15566.

a district court's grant of summary judgment we must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).

To determine whether a government employee is entitled to qualified immunity, we use a two-part test. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). First, we must determine whether, viewing the facts in the light most favorable to the plaintiff, the government employees violated the plaintiff's constitutional rights. *Id.* Then, if we determine that a constitutional violation has occurred, we must determine whether the rights were clearly established at the time of the violation. *Id.*

A

We turn first to the question of whether a policy of strip searching arrestees solely because they are classified for housing in the general population, in the absence of any reasonable suspicion, violates the arrestees' constitutional rights. Following a long history of precedent, we conclude that it clearly does.

**[1]** In the first case to raise the question, *Giles v. Ackerman*, 746 F.2d 614 (9th Cir. 1984) (per curiam), *overruled on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1040 n.1 (9th Cir. 1999) (en banc), we announced the governing standard that "arrestees for minor offenses may be subjected to a strip search only if jail officials have a reasonable suspicion that the particular arrestee is carrying or concealing contraband or suffering from a communicable disease." *Id.* at 615.[6]

---

[6]The dissent's suggestion that this standard was stated in dicta is disingenuous. The full text of the sentence quoted above is as follows: "We *hold* that arrestees for minor offenses may be subjected to a strip search

**[2]** We have revisited pre-arraignment searches several times, on each occasion reaffirming the individualized reasonable suspicion standard laid out in *Giles*. In *Ward v. County of San Diego*, 791 F.2d 1329 (9th Cir. 1986), we found no qualified immunity for a San Diego County Sheriff who had enacted a blanket strip search policy which resulted in the visual body cavity search of a misdemeanor arrestee prior to a determination regarding the arrestee's eligibility for an own recognizance release. In *Thompson v. City of Los Angeles*, 885 F.2d 1439 (9th Cir. 1989), we held that the strip search of a person arrested for felony grand theft auto was valid because the charge was "sufficiently associated with violence to justify a visual strip search." *Id.* at 1447. The next year, however, we held unconstitutional the City of Los Angeles's blanket strip search policy which subjected all felony arrestees to a visual body cavity search. *Kennedy v. Los Angeles Police Dept.*, 901 F.2d 702, 714 (9th Cir. 1990), *abrogated on other grounds by Hunter v. Bryant*, 502 U.S. 224 (1991) (per curiam). In *Kennedy*, we emphasized that while a charge of a *violent* offense, such as the charge in *Thompson*, may justify a strip search, the mere fact of a felony charge bears no reasonable relationship to institutional security concerns. *Id.* at 713 ("[T]he enacted policy, if it is to be constitutional, must be 'reasonably related' to the penal institution's interest in maintaining security."). In short, under controlling circuit precedent, a blanket strip search of pre-arraignment arrestees, no matter how minor the offense and in absence of reasonable suspicion, violates the Constitution.

Defendants argue that San Francisco's policy is constitutional under *Bell v. Wolfish,* 441 U.S. 520 (1979), in which

---

only if jail officials have a reasonable suspicion that the particular arrestee is carrying or concealing contraband or suffering from a communicable disease." *Giles*, 746 F.2d at 615 (emphasis added). The dissent may dislike the holding in *Giles* but there is no reasonable dispute that the above statement is the holding, not mere dicta.

the Supreme Court addressed a strip search policy applied to prisoners and pre-trial detainees. However, *Bell* pre-dated the pre-arraignment cases in our circuit, which carefully considered and distinguished *Bell*.

**[3]** In *Bell* the Supreme Court held that strip and visual body cavity searches may, in certain instances, be conducted on prisoners and pretrial detainees in institutional settings with less than probable cause. 441 U.S. at 560. In determining whether an institutional search policy is reasonable under the Fourth Amendment, a court must balance "the need for the particular search against the invasion of personal rights that the search entails." *Id.* at 559. In each case, a court "must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id. Giles*, *Ward*, *Thompson*, and *Kennedy* were each decided subsequent to, and with the benefit of, the Supreme Court's holding in *Bell*.

Defendants also argue that San Francisco's strip search policy was justified by the fact that the arrestees were to be transferred for housing in the general jail population, noting that the introduction of contraband to the general population raises serious security concerns. However, we have previously made clear that although the fact that an arrestee is to be "placed into contact with the general jail population" is one important factor among many that may be considered in gauging the reasonableness of a search, "such a factor by itself cannot justify a strip search." *Thompson*, 885 F.2d at 1447; *see also Giles*, 746 F.2d at 618-19 (rejecting the notion that placement in the general jail population was enough to validate a strip search because "intermingling is both limited and avoidable").

**[4]** "The intrusiveness of a body-cavity search cannot be overstated." *Kennedy*, 901 F.2d at 711. To justify such a "dehumanizing and humiliating," *id.*, invasion of privacy, there must be some reasonable relationship between the criteria used to identify the specific individuals eligible for a strip

search and the interest in preventing the introduction of contraband. *See Giles*, 746 F.2d at 618 (reasonableness requirement under the Fourth Amendment requires that the strip search bear some "discernible relationship to security needs" (quoting *Logan v. Shealy*, 660 F.2d 1007, 1013 (4th Cir. 1981))); *see also Kennedy*, 901 F.2d at 713 (stressing the importance of documentation supporting the assertion that arrestees within the strip search category smuggle contraband into the jail in greater frequency than arrestees outside of the category). We have consistently noted that factors to be considered in determining whether reasonable suspicion exists to warrant a strip search include "the nature of the offense, the arrestee's appearance and conduct, and the prior arrest record." *Giles*, 746 F.2d at 617; *see also Thompson*, 885 F.2d at 1446.

[5] The challenged portion of San Francisco's policy did not consider such individualized factors and required strip searches of arrestees based solely on their classification for housing in the general population. Defendants nonetheless argue that the present case is distinguishable from our long line of precedent because they have produced substantial documentary evidence of the significant problem of contraband in the general population of San Francisco jails. The district court carefully examined the tendered evidence and found that Defendants proffered no evidence demonstrating smuggling by individuals who would qualify for membership in the plaintiff class. Defendants argue that the record "established that many detainees charged with minor offenses tried to smuggle contraband into jail." However, both Plaintiffs and the district court correctly point out that of the numerous incidents of discovered contraband documented by Defendants and presented to the district court, none clearly documents a single uncontroverted instance of a class member smuggling contraband into a San Francisco facility.

Several of the documented searches were based on permissible factors and the documentation for the remaining inci-

dents does not contain any evidence relating either to the reason for the search or the arrestee's eligibility for class membership. To review, the class certified by the district court includes arrestees who were arrested for an offense not involving drugs, weapons, violence, or a violation of parole or probation; who did not have a criminal history involving drugs, weapons, or violence; and whose behavior did not create individualized suspicion warranting a search. The two incidents cited by the Defendants illustrate the deficiency of their documentation. First, Defendants point to an incident on November 19, 2003 in which a man who was arrested on a warrant for maintaining a public nuisance was found smuggling a plastic bag of suspected cocaine powder into the jail. The documentation of this incident in the record consists of an Incident Report and a Field Arrest Card. Neither document indicates whether the arrestee had a criminal history that would legitimize the search or whether there was any other individualized suspicion that would legitimize the search. Without more information, it is impossible to determine whether this particular arrestee would be eligible for class membership. Second, Defendants contend that a strip search of an arrestee, who was not charged with drugs, weapons or violence offenses, uncovered an 8-inch pair of scissors. The only documentation in the record of this incident is a Contraband Form. The Contraband Form does not indicate the charges on which this individual was arrested, the individual's criminal history, or whether there was any individualized suspicion that prompted the search. It is impossible to tell from the record whether or not this individual is in fact an eligible member of the class. In short, Defendants' claim that they have documented instances of eligible class members engaging in smuggling contraband is not credible and not supported by the record.[7]

---

[7]Because Defendants did not actually produce sufficient evidence, with respect to either of these incidents, to establish whether or not the searched individuals were eligible class members, we need not consider whether only two documented incidents would be sufficient to justify the policy.

The incidents cited by the dissent similarly fail to demonstrate even a single occurrence of a strip search uncovering contraband from an eligible class member. Of the twelve incidents cited by the dissent, two did not even involve strip searches,[8] and three others involved arrestees who were demonstrably ineligible for class membership because they were arrested on parole violation or drug charges. The documentation for the remaining seven incidents fails to include any information regarding the arrestees' criminal history or whether the arrestees did anything to create individualized suspicion warranting a strip search.

**[6]** As the district court concluded, the reports the defendant produced regarding the discovery of contraband during strip searches consistently fail to provide any indication of the charges of the searched individuals or the reason why they were searched. Absent such evidence, it is impossible for us to know whether or not eligible class members are contributing at all—much less in any significant way—to the contraband problem in the San Francisco jails. As such, we cannot conclude that there is any reasonable relationship between the criteria triggering a search (classification for housing) and the interest in conducting the search (eliminating the introduction of contraband).

**[7]** In sum, controlling precedent holds that blanket strip searches of pre-arraignment detainees regardless of severity of charge and without reasonable suspicion are unconstitutional. The district court properly concluded that the evidence tendered by Defendants was insufficient to distinguish this case from our long line of precedent based on case-specific circumstances.

---

[8]In one incident contraband was found in an arrestee's shoe, in the other contraband was found in the arrestee's mouth. Neither a search of a shoe nor of the inside of a person's mouth qualifies as a strip search.

B

We turn next to the question of whether the right violated by Defendants was clearly established at the time of the search. *See Saucier*, 533 U.S. at 201. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202. In other words, the inquiry is whether a reasonable person could have believed his actions lawful at the time they were undertaken. *Anderson v. Creighton*, 483 U.S. 635, 646 (1987).

We have made clear that the responsibility for keeping abreast of constitutional developments in criminal law falls squarely on the shoulders of law enforcement officials. "Given the power of such officials over our liberty, and sometimes even over our lives, this placement of responsibility is entirely proper. Law enforcement officials must be cognizant not only of how far their authority extends, but also of the point at which their authority ends." *Ward*, 791 F.2d at 1332.

**[8]** San Francisco's challenged strip search policy was in place until January 2004. Well before that time, as we have discussed, it was clearly established in this Circuit that conducting strip searches of pre-arraignment arrestees based solely on the fact that they were assigned for transfer to the general population was unconstitutional. We have consistently required consideration of individual factors, such as arrest charges, criminal history, and suspicious behavior, to justify strip searches of pre-arraignment arrestees. Indeed, in an unbroken line of precedent tracing back to 1984, we have affirmed and reaffirmed the fundamental holding of *Giles* that a strip search of a pre-arraignment detainee must be supported by reasonable individualized suspicion. It was also abundantly clear after *Thompson* that placement in the general jail population "by itself cannot justify a strip search." *Thompson*, 885 F.2d at 1447.

**[9]** Moreover, we have explicitly stated several times that it has been clearly established that strip search policies similar to San Francisco's are unconstitutional. In *Ward*, we concluded that "the law was sufficiently clear in *early 1981* so as to expose a public official who unreasonably authorized blanket strip searches of minor offense arrestees to civil liability under 42 U.S.C. § 1983." 791 F.2d at 1332 (emphasis added). Although San Francisco's policy included arrestees charged with more serious offenses than those at issue in *Ward*, the policy by definition also applied to minor offense arrestees, such as those at issue in *Ward*. San Francisco's policy required strip searches of all arrestees who were classified for transfer to the general population. Arrestees are "classified" if they cannot post bail. Because some minor offenses do require bail, any minor offense arrestee who was required to post bail but was unable (or unable to post soon enough) would be strip searched under San Francisco's policy. As *Ward* points out, we have long since established that strip searches of such individuals, in absence of individualized suspicion, is unconstitutional.[9]

District courts in this circuit have also consistently recognized that the law in this circuit has clearly established that strip search policies like the one challenged here are unconstitutional.[10] *See, e.g., Craft v. County of San Bernardino*, 468

---

[9]Again, in 1993 we reiterated:

At the time Appellants strip searched the Appellees, it was clearly established in this circuit that it is unlawful to strip search an arrestee brought to a jail facility on charges of committing a minor offense, unless the officer directing the search possesses "a reasonable suspicion that the individual arrestee is carrying or concealing contraband." Reasonable suspicion may be based on "such factors as the nature of the offense, the arrestee's appearance and conduct, and the prior arrest record."

*Act Up!/Portland v. Bagley*, 988 F.2d 868, 871-72 (9th Cir. 1993) (quoting *Giles*, 746 F.2d at 617) (internal citations and footnote omitted).

[10]Defendants cite *Johannes v. Alameda County Sheriff's Dept.*, 2006 WL 2504400, *12 (N.D. Cal. 2006) to argue that the state of the law in

F.Supp.2d 1172, 1177 (C.D. Cal. 2006) ("At the outset, it is worth noting that the Ninth Circuit has clearly recognized that arrestees' intermingling with other detained persons can impact upon whether a given strip and/or visual body cavity search is constitutionally permissible, but it cannot, by itself, provide justification for such a search . . .") (citing *Thompson*, 885 at 1447); *Wong v. Beebe*, 2002 WL 31548486, *15 (D. Or. 2002)[11] ("[W]ell before [arrestee's] strip and cavity search, it was clear that blanket strip search policies are unconstitutional if justified by nothing more than an arrest on suspicion of the commission of a felony or a planned confinement in the general jail population.") (citing *Kennedy*, 901 F.2d at 713-15; *Thompson*, 885 F.2d at 1446-47); *Silvia v. Clackamas County*, 2001 WL 34039482, *4 (D. Or. 2001) ("Well before [arrestee's] strip and cavity search, it was clear that blanket strip search policies justified by nothing more than arrest on suspicion of the commission of a felony or a planned confinement in the general jail population are unconstitutional.") (citing *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1445-46 (9th Cir. 1991); *Kennedy*, 901 F.2d at 713-15; *Thompson*, 885 F.2d at 1446-47).

Defendants argue that the large amount of documentary evidence they have produced shows that the problem of smuggled contraband is particularly acute in the San Francisco jails and thus distinguishes this case from others. Further, defendants argue that because no other case has

---

this circuit was not clearly established. However, the district court opinion in *Johannes* does not suggest that a policy such as San Francisco's policy might be constitutionally permissible. The *Johannes* court analyzed a strip search policy as applied to an individual plaintiff and did not express an opinion about the constitutionality of the policy on its face. The court concluded that, among other factors, Johannes' lengthy criminal history provided a valid basis for a strip search. Here, arrestees with similar criminal histories are not included in the class.

[11]In determining whether a particular right was clearly established, we may also look to unpublished district court decisions. *Sorrels v. McKee*, 290 F.3d 965, 971 (9th Cir. 2002).

confronted such a well-documented problem, even if San Francisco's policy was unconstitutional, the law was not clearly established. In deciding whether the law was clearly established, "[i]t is not necessary that the alleged acts have been previously held unconstitutional, as long as the unlawfulness [of the defendants' actions] was apparent in light of preexisting law." *Malik v. Brown*, 71 F.3d 724, 727 (9th Cir. 1995). "Closely analogous preexisting case law is not required to show that a right was clearly established." *White v. Lee*, 227 F.3d 1214, 1238 (9th Cir. 2000). The specific facts of previous cases need not be materially or fundamentally similar to the situation in question; rather, the salient question is whether the state of the law at the time gives officials fair warning that their conduct is unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 742 (2002).

[10] We have made it clear that in the Ninth Circuit strip searches of pre-arraignment arrestees are unconstitutional in the absence of reasonable individualized suspicion and that reasonable suspicion requires consideration of factors such as the nature of the offense, the arrestee's appearance and conduct, and the arrestee's criminal history. *See, e.g.*, *Act Up!*, 988 F.2d at 871-72; *Edgerly*, 495 F.3d at 657. Moreover, we have made it clear that placement in the general jail population "by itself cannot justify a strip search." *Thompson*, 885 F.2d at 1447. San Francisco's policy was to strip search pre-arraignment arrestees no matter how trivial the offense charged and without reasonable suspicion solely because they were to be classified for housing in the general population. That such a blanket policy is a clear violation of the Constitution is clearly established by our precedent.

[11] The fact that San Francisco had documented a significant problem of contraband smuggling does not muddy the clarity of the law. The evidence Defendants produced to the district court shows only that contraband smuggling was a significant problem in San Francisco jails; it does not demonstrate that persons eligible for inclusion in the class in this

case contributed significantly, or even at all, to that problem.[12] Therefore, San Franciso's policy, and its justifications for that policy, are not different enough from policies that we have held unconstitutional, to suggest that the rights violated by San Francisco's policy were not clearly established. For these reasons, Sheriff Hennessey is not entitled to qualified immunity.

### III

In conclusion we emphasize that our holding in no way prevents correctional facilities from strip searching inmates under permissible circumstances. Indeed, we do not today even discuss the rights of those who are incarcerated after having been convicted of a criminal offense. This case concerns only pre-trial arrestees. Moreover, strip searches of arrestees on the basis of their arrest for an offense involving drugs, weapons, violence, or a violation of probation or parole; criminal history involving drugs, weapons or violence as specified by the district court; or another factor creating individualized suspicion are not affected by our holding, as these arrestees are excluded from the certified class. However, a policy of strip searching arrestees based solely on their classification for housing in the general population violates the arrestees' clearly established constitutional rights, and we thus affirm the district court's denial of qualified immunity.

**AFFIRMED.**

---

IKUTA Circuit Judge, concurring:

I concur in the majority's opinion with reluctance and grave concern. While compelled by Ninth Circuit case law, the disposition is in tension with Supreme Court precedent.

---

[12]*See supra* Part II.A.

Moreover, by disregarding the jail administrators' urgent concerns about a serious contraband smuggling problem, I agree with the dissent that we are potentially putting lives in the San Francisco detention system at risk.

A

In *Bell v. Wolfish*, the Court established basic principles for analyzing the constitutionality of "restrictions and practices that were designed to promote security and order" at a detention facility. 441 U.S. 520, 544 (1979). The Court made clear that a detainee's constitutional rights may be limited or retracted to further the goal of "maintaining institutional security and preserving internal order and discipline." *Id.* at 546. Because of the fundamental importance of internal security within a detention facility, "even when an institutional restriction infringes a specific constitutional guarantee . . . the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." *Id.* at 546-47. Courts must accord "wide-ranging deference" to the judgment of detention facility administrators "in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 547. Further, "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Id.* at 548 (internal quotation marks omitted).

Applying these principles to the petitioners' Fourth Amendment challenge, the Court upheld the detention facility's policy of conducting a body-cavity search after a detainee had a contact visit with a person outside the facility. The Court made clear that a fact-intensive balancing test is necessary to determine whether a practice is reasonable for Fourth Amendment purposes:

> The test of reasonableness under the Fourth Amend-
> ment is not capable of precise definition or mechani-
> cal application. In each case it requires a balancing
> of the need for the particular search against the inva-
> sion of personal rights that the search entails. Courts
> must consider [1] the scope of the particular intru-
> sion, [2] the manner in which it is conducted, [3] the
> justification for initiating it, and [4] the place in
> which it is conducted.

*Id.* at 559 (bracketed numbers added). While acknowledging
that a body cavity search is intrusive, and that searches may
on occasion be conducted in an abusive fashion, the Court
focused primarily on the third and fourth factors: the unique
nature of a detention facility, which is "fraught with serious
security dangers," *id.*, and the central importance of maintain-
ing the institution's security, which is a key principle in ana-
lyzing all constitutional challenges to detention facility
policies and practices, *id.* at 546-47. The Court then readily
concluded, after "[b]alancing the significant and legitimate
security interests of the institution against the privacy interests
of the inmates," that the detention facility's practice was rea-
sonable under the Fourth Amendment. *Id.* at 560.

In reaching this conclusion, the Court rejected the Second
Circuit's analysis, which had focused on whether there was
sufficient evidence that detainees had smuggled contraband
into the facility. Because the administrators "proved only one
instance in the [detention facility's] short history where con-
traband was found during a body-cavity search," the Second
Circuit had held that the "gross violation of personal privacy
inherent in such a search cannot be outweighed by the govern-
ment's security interest in maintaining a practice of so little
actual utility." *Id.* at 558 (internal quotation marks omitted).
By contrast, the Court concluded that the lack of evidence of
actual contraband smuggling was of little import. *Id.* at 559.

### B

In this suit against the City and County of San Francisco, *Bell* requires us to balance "the significant and legitimate security interests of the institution" against the privacy rights of the plaintiff class of pre-arraignment detainees. *See id.* at 560. As we have noted, the "intrusiveness of a body-cavity search cannot be overstated. Strip searches involving the visual exploration of body cavities is dehumanizing and humiliating." *Kennedy v. Los Angeles Police Dept.*, 901 F.2d 702, 711 (9th Cir. 1990), *abrogated on other grounds by Hunter v. Bryant*, 502 U.S. 224 (1991). On the other hand, as correctly noted by the dissent, San Francisco has presented "a compelling record of dangerous smuggling activity" indicating that there is a "pervasive problem that imposes a serious security risk endangering both jail inmates and jail employees." Dissent at 11498. San Francisco has emphasized that its strip search policy is needed to help mitigate the smuggling problems in the jail population. In considering whether the policy was reasonable, we must defer to the judgment of the jail administrators. *See Bell*, 441 U.S. at 547. If we did so, and thereby followed the directive of the Supreme Court, we would be compelled to uphold the strip search policy as reasonable given the substantial evidence in the record illustrating the dire security needs facing the facility.

But Ninth Circuit precedent has wandered far from *Bell*, as the dissent points out. Beginning in 1984 with *Giles v. Ackerman*, 746 F.2d 614 (9th Cir. 1984), *overruled on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999) (en banc), we disregarded *Bell*'s direction to give the detention facility administrator's needs for "safeguarding institutional security" exceptional weight in determining whether a search policy is reasonable. *See Bell*, 441 U.S. at 547. Instead, we held that a strip search of an arrrestee for a minor offense was not constitutionally reasonable unless jail officials had a specific basis for suspecting that individual of smuggling. *Giles*, 746 F.2d at 615. Rejecting the district

court's conclusions and giving effectively no deference to the jail officials' views, we held as a matter of law that strip searches of all arrestees booked into the jail at issue were "not necessary to protect the institution's security interest," and that "arrestees charged with minor offenses may be subjected to a strip search only if jail officials possess a reasonable suspicion that the individual arrestee is carrying or concealing contraband." *Id.* at 617.

Although *Giles* may have justified its conclusion on the basis of appellate fact-finding specific to that case, i.e., that the jail facility in that case did not present security concerns, the *Giles* rule subsequently took on a life of its own. In *Kennedy* we concluded that the LAPD's policy of conducting a strip search of all felony arrestees violated the Fourth Amendment. 901 F.2d at 710-14. Rather than give due weight to the LAPD's concerns "for safety, security, and the proper administration of the jail system," *id.* at 713 (internal quotation marks omitted), we faulted the LAPD for failing to present class-specific information, stating that a "glaring omission from the LAPD's justification is any documentation (or even assertion) that felony arrestees have attempted to smuggle contraband into the jail in greater frequency than misdemeanor arrestees." *Id.* at 713. Because the LAPD failed to adduce evidence regarding "the likelihood of the arrestee's concealing drugs, weapons, or contraband," *id.* at 714, we held that the LAPD's policy could not be "reasonably related to the penal institution's interest in maintaining security," *id.* at 713.

Similarly, in *Thompson v. City of Los Angeles*, 885 F.2d 1439 (9th Cir. 1989), we considered the Los Angeles County's policy to strip search all new admittees to the county jail, and held that the reasonableness of the search depended on whether a specific arrestee's offense was "sufficiently associated with violence to justify a visual strip search." *Id.* at 1447. In so holding, we rejected the County's institutional concerns regarding placing individuals "into contact with the general jail population," stating as a matter of law that "such a factor

by itself cannot justify a strip search" because "such intermingling is 'both limited and avoidable.' " *Id.* (quoting *Giles*, 746 F.2d at 618).

In each of these cases, we gave short shrift to *Bell*'s focus on the centrality of institutional security concerns and to its instruction to defer to detention facility officials' judgment "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations." *Bell*, 441 U.S. at 548 (internal quotation marks omitted). Instead of balancing individual privacy concerns against the "significant and legitimate security interests of the institution," *id.* at 560, we have focused almost exclusively on the question whether detention facility administrators have an adequate basis for suspecting that individuals may be smuggling contraband. In doing so, we have essentially adopted the rationale of the Second Circuit, rejected by *Bell*, which gave controlling weight to the lack of specific evidence of a smuggling problem. In sum, the Ninth Circuit's balancing test bears little relation to *Bell*'s.

C

Applying this circuit's balancing test to the facts in this case, we could uphold San Francisco's blanket policy of strip searching the plaintiff class of pre-arraignment detainees only if San Francisco presented some basis for suspecting that class of smuggling contraband. Because I agree with the majority that San Francisco has not adduced evidence of contraband smuggling specific to the plaintiff class, and because I am bound by circuit precedent, I must reluctantly concur in the majority's determination that the strip search policy was unconstitutional. *See Cerrato v. San Francisco Cmty. Coll. Dist.*, 26 F.3d 968, 972 n.15 (9th Cir. 1994) ("In the absence of an en banc reversal or an intervening Supreme Court decision . . . we are bound by circuit law."). Moreover, because our circuit precedent clearly mandates this result, I must also

concur in the majority's determination that Sheriff Hennessey is not entitled to qualified immunity.

This result, however, ignores San Francisco's warnings that the smuggling problems in the San Francisco detention system are grave. It also ignores the jail administrators' determination that mandatory strip searches of all persons entering the general jail population are needed to address this problem. By effectively eliminating such security concerns from our calculus, we contradict Supreme Court precedent and common sense and take upon ourselves a role unsuited for the courts. As the Supreme Court noted, judges must guard against the all-too-human tendency "to believe that their individual solutions to often intractable problems are better and more workable than those of the persons who are actually charged with and trained in the running of the particular institution under examination." *Bell*, 441 U.S. at 562. Because we have dangerously substituted our judgment for the judgment of jail administrators, a reconsideration of our case law is urgently needed.

TALLMAN, Circuit Judge, dissenting:

Our ship has sailed far from the course charted by the United States Supreme Court in *Bell v. Wolfish*, 441 U.S. 520 (1979). During the three-year period between April 2000 and December 2003, the San Francisco Sheriff's Department ("San Francisco") discovered over 1,000 items of contraband smuggled into its general jail populations.[1] In July 2005, an

---

[1]The contraband was discovered during searches conducted by San Francisco's canine unit. Items found included: 662 pills of assorted controlled substances; 106 shanks and weapons; 272 lighters and matches; 13 tattoo needles; 45 finds of rock cocaine (totaling 42.88 grams); 3 finds of cocaine powder (totaling 2.75 grams); 10 finds of methamphetamine (totaling 6.70 grams); 40 finds of marijuana (totaling 71.93 grams); 18 finds of heroin (totaling 6.24 grams and 6.79 milliliters); 24 gallons of "pruno"; 4 hypodermic needles; and 4 ecstasy pills.

inmate booked and classified at County Jail No. 9 died from a cocaine overdose eleven days after he was transferred to County Jail No. 2 for housing in the general population. The inmate had been charged with felony domestic violence and violating probation, and therefore was subject to a strip search on admission to the booking facility under the Sheriff's policy. There is no record that drugs were found on this inmate during intake.

As the empirical evidence from jail operations now shows, the underlying rationale for Ninth Circuit decisions in this arena suffers from an inherent defect in basic logic. The assumption is that arrestees booked for only minor or nonviolent offenses who will not be promptly released and must be housed with the general inmate population are unlikely to be carrying concealed contraband or dangerous weapons. Experience teaches otherwise. The County's[2] smuggling problem is not isolated to those inmates booked for crimes involving drugs, weapons, or violence. The record is replete with incidents of jail officials finding contraband during strip searches of individuals arrested for "minor offenses": public drunkenness, public nuisance, loitering with intent to prostitute, knowingly receiving stolen property, petty theft with a prior offense, etc.[3]

---

[2]I refer to the City and County of San Francisco collectively as "the County." Arrestees may include those taken into custody by law enforcement agencies including the San Francisco Police Department and the Sheriff's Department.

[3]Some of this information was taken from the record filed in a case involving a similar challenge to the same strip search policy, *Yourke v. City and County of San Francisco*, No. 06-16450. *Yourke* was dismissed prior to oral argument for lack of jurisdiction. We granted San Francisco's motion to take judicial notice of portions of the *Yourke* record on appeal. Accordingly, the record we now consider includes additional Sheriff's Department documents of smuggling incidents that supplement the *Bull* record. Together, these records paint a bleak picture of responsible County Jail officials struggling to adhere to ever stricter court decisions while vainly trying to keep everyone safe from harm.

We have never before been presented with such a compelling record of dangerous smuggling activity. San Francisco has demonstrated beyond cavil that the smuggling of drugs, weapons, and other contraband into the general jail population is a common and pervasive problem that imposes a serious security risk endangering both jail inmates and jail employees. While acknowledging the existence of this evidence, the majority extends Ninth Circuit restrictions and adopts a per se rule requiring reasonable suspicion to strip search a pretrial detainee transferred into the general population for housing who does not otherwise meet the category of arrestees the majority approves for strip-searching. But the newly-minted rule runs contrary to Supreme Court precedent, impedes jail administration, and further endangers the safety of jail inmates and employees. Because I would conclude that San Francisco's policy of strip searching every arrestee transferred into its general jail population for housing is reasonable under the Fourth Amendment, I would find no constitutional violation from the strip search policy. I would also reverse the district court's denial of qualified immunity to Sheriff Michael Hennessey. I therefore respectfully dissent.

I

In *Bell v. Wolfish*, 441 U.S. 520 (1979), the Supreme Court considered the constitutionality of New York's Metropolitan Correctional Center's ("MCC") policy of strip searching inmates following any contact visit with a person from outside the institution. *Id.* at 523, 528, 558-60. To support the policy, "[c]orrections officials testified that visual cavity searches were necessary not only to discover but also to deter the smuggling of weapons, drugs, and other contraband into the institution." *Id.* at 558. During the policy's "short history" only one body-cavity search resulted in contraband being found. *Id.*

The Supreme Court nevertheless "[b]alanc[ed] the significant and legitimate security interests of the institution against

the privacy interests of the inmates" and held that the "visual body-cavity inspections . . . contemplated by the MCC rules can . . . be conducted on less than probable cause." *Id.* at 560. Even though the Court could "not underestimate the degree to which these searches may invade the personal privacy of inmates," it concluded that the institution's compelling security interests justified the invasion of personal rights that resulted. *Id.* at 559-60. As the Court explains:

> A detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence. And inmate attempts to secrete these items into the facility by concealing them in body cavities are documented in this record, and in other cases. That there has been only one instance where an MCC inmate was discovered attempting to smuggle contraband into the institution on his person may be more a testament to the effectiveness of this search technique as a deterrent than to any lack of interest on the part of the inmates to secrete and import such items when the opportunity arises.

*Id.* at 559 (citations omitted).

Subsequent to *Bell*, we have considered several other strip search policies, yet at no time have we considered a record as fully developed and complete as that provided by San Francisco in support of its policy. In *Giles v. Ackerman*, 746 F.2d 614 (9th Cir. 1984) (per curiam), *overruled on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1040 n.1 (9th Cir. 1999) (en banc), we held "that arrestees for minor offenses may be subjected to a strip search only if jail officials have a reasonable suspicion." *Id.* at 615. The *Giles* panel purported to follow *Bell* by claiming to balance "the security needs of [the] local jail facilities against the privacy interests of arrestees charged with minor offenses." *Id.* at 617. Unlike *Bell*, however, *Giles* concluded that the Idaho county failed to

demonstrate that its security interests justified the serious invasion of privacy created by its policy. *Id.* at 617.

> The record reveals that the incidence of smuggling activity at the Bonneville County Jail is minimal. Evidence before the trial court indicates that of approximately 3,500 persons searched at the jail in the preceding 18-month period, only eleven persons had concealed anything that warranted a report, including the concealment of cigarettes. [The county] cite[d] as significant only one discovery in the course of 3,500 strip searches: a knife was found cradled in the small of the back of an arrestee. [The county] also cite[d] two instances from other parts of the country (California and Mississippi) in which matches were concealed on the person of detainees.

*Id.*

Based on the Idaho record, we also concluded that there was no sign "whatsoever that the County's strip search policy could or did have any deterrent effect." *Id.* We noted that "arrest and confinement in the Bonneville County Jail are unplanned events, so the policy could not possibly deter arrestees from carrying contraband." *Id.* Based on this record, we rejected the county's argument that the search was justified by the fact that Giles had been placed in the general jail population. *Id.* at 618-19 ("[The county's] heavy reliance on the intermingling of its temporary detainees with the general [jail] population is misplaced . . . because such intermingling is both limited and avoidable." (internal quotation marks omitted; second alteration in original)).

We reached a similar conclusion in *Kennedy v. Los Angeles Police Department*, 901 F.2d 702 (9th Cir. 1990), *abrogated on other grounds by Hunter v. Bryant*, 502 U.S. 224 (1991) (per curiam). There, we found unconstitutional the Los Angeles Police Department's ("LAPD") policy subjecting all

arrestees on suspicion of having committed a felony to a strip search, whether or not they were transferred to the general jail population. *Id.* at 710, 713-14. We found no justification for treating felony arrestees any differently than misdemeanor arrestees, who were subject to a strip search only upon reasonable suspicion. *Id.* at 714. There was simply no reasonable relationship between the strip search and the LAPD's alleged security needs because the LAPD failed to provide "any documentation (or even assertion) that felony arrestees have attempted to smuggle contraband into the jail in greater frequency than misdemeanor arrestees." *Id.* at 713.

The majority cites *Giles* as well as *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1447 (9th Cir. 1989), for the proposition that contact with the general jail population itself can never justify a strip search. Maj. Op. at 11481-83. However, neither case addressed a record as persuasive as that presented by San Francisco, and both cases based their holdings on separate legal grounds, making their broad pronouncements dicta. As discussed supra, our prior holding in *Giles* was based primarily on the Bonneville County Jail's failure to provide evidence to prove it had security concerns that warranted such a severe invasion of privacy. *See* 746 F.2d at 617. Without a full and complete record, we were in no position to determine as a matter of law that placement in a general jail population could *never* by itself justify a strip search. "Where it is clear that a statement is made casually and without analysis, where the statement is uttered in passing without due consideration of the alternatives, or where it is merely a prelude to another legal issue that commands the panel's full attention," such a statement may be considered dicta. *United States v. Johnson*, 256 F.3d 895, 915 (9th Cir. 2001) (en banc) (Kozinski, J.); *cf. United States v. Ingham*, 486 F.3d 1068, 1078 n.8 (9th Cir. 2007) (concluding that the court's decisions on ex post facto principles was not dicta when the court provided a "careful three-page" analysis). The same holds true for our analysis in *Thompson.* With absolutely no discussion of the record, we cited *Giles* and simply stated that "contact with the

general jail population . . . by itself cannot justify a strip search." *Thompson*, 885 F.2d at 1447. However, that statement was not central to our holding, *see Sanchez v. Mukasey*, 521 F.3d 1106, 1110 (9th Cir. 2008) (discussing what constitutes dictum), as we went on to conclude that the city's search in *Thompson* was nevertheless justified by reasonable suspicion. *See Thompson*, 885 F.2d at 1447.[4]

Now, with a full and complete record, we are squarely confronted with the question of whether transfer into the general jail population alone can justify a strip search.[5] Never has the Supreme Court required reasonable suspicion of weapons or contraband to justify a strip search of pretrial detainees bound

---

[4]Contrary to the majority's statement, I do not contend that the following holding in *Giles* is dicta: "arrestees for minor offenses may be subjected to a strip search only if jail officials have a reasonable suspicion that the particular arrestee is carrying or concealing contraband or suffering from a communicable disease." *See* Maj. Op. 11480-81 n.6. Although I may have decided *Giles* differently, I nevertheless respect the decision's precedential value. Unlike the majority, however, I think the panel in *Giles* unnecessarily went beyond the question presented when it stated that contact with the general jail population alone *can never* justify a strip search. This was a blanket conclusion without any analysis. Without a full and complete record the court could not give due consideration to the issue. Whether contact with the general jail population alone can ever justify a strip search when the County here has trenchantly documented a pervasive smuggling problem therefore remains an open question.

[5]I must emphasize that San Francisco's policy did not require the strip search of every arrestee brought into County Jail No. 9. San Francisco's policy required only the search of those inmates who were classified for housing and were going to be transferred into the general jail population. Therefore, the other cases relied on by the majority are similarly distinguishable as they do not involve arrestees subsequently transferred to the general population for housing. *See Ward v. County of San Diego*, 791 F.2d 1329, 1333 (9th Cir. 1985) (finding unconstitutional a blanket strip search policy that allowed officials to search a detainee before a determination was made that she could be released on her own recognizance); *Act Up!/Portland v. Bagley*, 988 F.2d 868, 871-72 (9th Cir. 1993) (holding that it was clearly established law as of 1989 that "it is unlawful to strip search an arrestee brought to a jail facility on charges of committing a minor offense").

for the general prison population.[6] *See Bell*, 441 U.S. at 559-60; *see also Evans v. Stephens*, 407 F.3d 1272, 1278-79 (11th Cir. 2005) (en banc); *id.* at 1285-86 (Carnes, J., specially concurring). While other circuits have held that transfer into the general population on a misdemeanor charge without more is insufficient to justify a strip search, *see Evans*, 407 F.3d at 1285 (Carnes, J., specially concurring) (collecting cases),[7] at least one of those circuits has openly questioned its reasoning.

In *Evans*, the Eleventh Circuit went en banc to address its case law holding that "[a]rrestees who are to be detained in the general jail population can constitutionally be subjected to a strip search only if the search is supported by reasonable suspicion that such a search will reveal weapons or contraband." *Id.* at 1278 (internal quotation marks omitted). Because the en banc court decided the case on other grounds, it never reached that question. *Id.* Nevertheless, it found the need to state: "Most of us are uncertain that jailers are required to have a reasonable suspicion of weapons or contraband before strip searching—for security and safety purposes —arrestees bound for the general jail population." *Id.* As discussed in more detail infra, Judge Carnes, joined by Judges Dubina and Hull, elaborated further on this view in a special concurrence.

There is no dispute that in addressing the constitutionality

---

[6]Indeed, that was the basis for Justice Powell's dissent in *Bell*. *See* 441 U.S. at 563 (Powell, J. dissenting) ("I join the opinion of the Court except the discussion and holding with respect to body-cavity searches. In view of the serious intrusion on one's privacy occasioned by such a search, I think at least some level of cause, such as a reasonable suspicion, should be required to justify the anal and genital searches described in this case.").

[7]I recognize that *Evans* cites our decision in *Giles* as standing for such a proposition. However, as noted above, *Giles*'s statement regarding the transfer of inmates into the general population is dictum and not binding precedent.

of this particular policy, we must "balanc[e] . . . the need for the particular search against the invasion of personal rights that the search entails." *Thompson*, 885 F.2d at 1445. The prevention of the introduction of weapons or other contraband into jail facilities is an extremely weighty governmental interest. *Id.* at 1446; *see also Bell*, 441 U.S. at 547, 559-60 (prevention of smuggling of drugs, weapons, and other contraband is a significant and legitimate prison security interest); *Evans*, 407 F.3d at 1289 (discussing how smuggling of contraband undermines jail security). In *Evans*, Judge Carnes discussed at length expert testimony provided in *Dodge v. County of Orange*, 282 F. Supp. 2d 41 (S.D.N.Y. 2003), *remanded on other grounds*, 103 Fed. Appx. 688 (2d Cir. 2004), a case addressing the constitutionality of a policy requiring all pretrial detainees to be strip searched upon admission to the county jail.[8] In *Dodge*, both sides' experts agreed that " 'one of the primary objectives of any correctional facility must be to prevent the introduction of "contraband" into a correctional facility due to the dangers that contraband presents in a correctional setting.' " *Evans*, 407 F.3d at 1289 (quoting *Dodge*, 282 F. Supp. 2d at 46). " 'Prison administrators therefore should be accorded wideranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.' " *Id.* at 1289-90 (quoting *Bell*, 441 U.S. at 547).

---

[8]Bound by Second Circuit precedent, the district court in *Dodge* ultimately concluded that the strip search policy of the Orange County Correctional Facility in New York was unconstitutional. Nevertheless, the district court felt obliged to record its disagreement with Second Circuit precedent noting that the record in the *Dodge* case demonstrated that jail administrators "face very real potential security concerns from any new arrival." 282 F. Supp. 2d at 82. The court went on to state that it was hard for it "to articulate a principled reason why an inmate cannot be strip searched without reasonable suspicion of contraband carriage when he arrives at [the Orange County Correctional Facility] but can lawfully be strip searched after a court date or during a cell shakedown on 'less than probable cause.' " *Id.* (citing *Bell*, 441 U.S. at 560).

San Francisco has sufficiently demonstrated that smuggling of contraband has resulted in a serious risk to inmates and jail employees. The County discovered over 1,000 items of contraband during a three-year period starting in 2000. An inmate died from a drug overdose apparently after he procured the drug inside the jail. To further illustrate the problem, I detail some of the incidents described in the record:

- April 29, 2000: Officials found a white "rock like" object the size of a marble between the buttocks of a man arrested for obstructing a peace officer, driving under the influence, and a parole violation. The inmate grabbed and swallowed the object, requiring a trip to the emergency room.

- August 1, 2001: Officials found a bag filled with an unknown type of white pills in the mouth of a woman arrested for shoplifting and on a warrant for forgery.

- August 10, 2001: Officials found a plastic baggie containing several off-white rocks individually wrapped in plastic in the buttocks area of a man arrested for public drunkenness.

- June 23, 2002: Officials found a plastic bag containing white powder inside the vagina of a women arrested for receiving stolen property.

- January 15, 2003: Officials found a syringe containing 20 cc's of brown liquid in the anus of a man arrested for a parole violation.

- November 29, 2003: Officials found a syringe in the vagina of a female inmate arrested on an out-of-county warrant for drunk driving.

- • December 29, 2003: Officials found a crack pipe and case in the vagina of a woman arrested for traffic violations.[9]

The majority struggles mightily to discount this record, stating that there is no clear documentation proving a smuggling incident by an arrestee that would qualify as a member of the Plaintiffs' class. Maj. Op. 11483-85. The question in *Bell*, however, was not whether the individual security risk of one particular person warranted a search, but whether the security risks of an entire institution justified the jail's policy. On this record, the majority cannot deny that San Francisco faces an extensive smuggling problem. It nevertheless assumes that San Francisco can remedy the smuggling problem, and overcome the security risks that problem creates, without strip searching any member of Plaintiffs' class even though each class member is to be commingled with the general jail population. With all due respect to my colleagues, the fallacy of the assumption on which that conclusion is based will endanger the safety of future inmates and jail employees.

As Judge Carnes explains in his special concurrence, and as this record so forcefully demonstrates, the security risk to jail facilities exists whether the inmate was arrested on a misdemeanor or a felony, or whether the inmate has a criminal history or no prior record. *Evans*, 407 F.3d at 1291 (Carnes, J., specially concurring). " '[O]fficials at a county jail . . . usually know very little about the new inmates they receive or the security risk they present at the time of their arrival.' " *Id.* (second alteration in original) (quoting *Dodge*, 282 F. Supp. 2d at 38). Moreover, there is no doubt that gang affiliation of

---

[9]This list provides but a small sample of the twenty-eight incidents set forth in the combined record of which we have taken judicial notice. *See supra* n. 3. The location of the contraband items—whether it be in the shoe, mouth, vaginal or anal cavity of the inmate being searched, *see* maj. op. 11485 & n.8—does not change the fact that San Francisco faces a serious smuggling problem and the problem is not isolated to those offenders arrested for crimes involving drugs, weapons, or violence.

inmates is a serious security risk. *Id.* at 1289. Statistics of inmate gang affiliation in San Francisco County Jails are not provided in this record, but as an example, "[a]t the county jail involved in the *Dodge* case there were at least fifty gang members being held on any given day." *Id.* " 'Gang members are often more violent, dangerous, and manipulative than other inmates, regardless of the nature of the charges against them. They are also more likely than other inmates to attempt to coerce family members or to coerce, cajole, or intimidate lesser violators into smuggling contraband into the facility.' "[10] *Id.* (alteration omitted) (quoting *Dodge*, 282 F. Supp. 2d at 48).

Inmates returning from a court appearance outside the jail pose the same risk to the general jail population upon return as do new arrestees coming in from the outside. The majority's failure to recognize the current smuggling problem and acknowledge the lengths that determined criminals will go to smuggle contraband and weapons inside a jail or prison merely highlights why the Supreme Court has continually told us to give special deference to jail house administrators where safety and security concerns are at issue. *See, e.g.*, *Bell*, 441 U.S. at 562.

We must also consider the far ranging implications of the majority's rule on county jails located throughout our circuit. San Mateo County Sheriff Don Horsley and the County of San Mateo ("Amici"), defendants in another pending class action lawsuit in the United States District Court, Northern

---

[10]This evidence undermines the limited reasoning provided in *Giles*. *See* 746 F.2d at 617 (stating that "arrest and confinement in the Bonneville County Jail are unplanned events, so the policy could not possibly deter arrestees from carrying contraband"). We now know that inmates will go to great lengths to get contraband into jail facilities, where the contraband may be worth more than it is on the street. Therefore, a policy that requires jail officials to strip search every transferee into the general jail population will have more of a deterrent affect than the limited search policy our precedent now permits.

District of California, filed an amicus brief in support of San Francisco. Amici also had a policy of strip searching every arrestee who was going to be housed in San Mateo County's general jail population.[11] For a five-month period in 2004, Amici seized forty-one items of contraband found during strip searches conducted in San Mateo County Jails. Items confiscated as a result of these strip searches included the following: a hypodermic needle secreted in an arrestee's buttocks; a razor blade found in a woman's bra; a pocket knife found in a woman's bra; a small bag containing methamphetamine inside a woman's bra; suspected heroin secreted between an inmate's buttocks; and suspected methamphetamine secreted between an inmate's buttocks.

This evidence proves jail officials need greater flexibility than Ninth Circuit jurisprudence permits to adequately address the security risks they face in safely running county lockups. San Francisco, San Mateo, and other county jails across the country have not exaggerated the need for strip searches. The Supreme Court has told us that an inmate's constitutional rights must yield to the legitimate penological and safety concerns of the institution which houses commingled pretrial detainees with sentenced prisoners. *See Bell*, 441 U.S. at 547. By failing to give sufficient weight to the security risk posed by the smuggling of contraband into jail facilities, the majority has neglected to follow the Court's directive to balance an institution's security interests against the privacy intrusion that undoubtedly takes place as a result of the intrusive search. *See id.* at 546-47.

Ninth Circuit jurisprudence has deviated far off the course the Supreme Court has charted. Because San Francisco has demonstrated that it faces a pervasive smuggling problem that can only be mitigated by a policy requiring the search of

---

[11]Sometime in 2003, in response to adverse judicial rulings, Amici changed their strip search policy so that only arrestees charged with crimes involving drugs, violence, or weapons are strip searched.

every arrestee transferred for housing among the County's general jail population, I would hold that San Francisco's justified safety interest outweighs the privacy intrusion caused by such a search. It was reasonable under the Fourth Amendment and resulted in no constitutional violation under the first prong of *Saucier v. Katz*, 533 U.S. 194 (2001).

II

I also disagree with the majority's conclusion regarding the second prong of the qualified immunity inquiry, whether, in light of clearly established law, a reasonable officer could have known his/her conduct was unlawful. *See id.* at 201-02. To answer this question we must determine "whether [Sheriff Hennessey] could . . . have reasonably but mistakenly believed that his . . . conduct did not violate a clearly established constitutional right." *Jackson v. City of Bremerton*, 268 F.3d 646, 651 (9th Cir. 2001).

"[R]easonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Bell*, 441 U.S. at 559. "We must therefore balance the security needs of local jail facilities against the privacy interests of arrestees charged with minor offenses to determine what objective standard authorizes strip searching of arrestees." *Giles*, 746 F.2d at 617; *see also Savard v. Rhode Island*, 338 F.3d 23, 29 (1st Cir. 2003) ("The constitutional line that separates permissible from impermissible uses of these methods is imprecise and context-specific . . . . [P]lotting that line requires a determination of what is reasonable under a given set of circumstances.").

Prior to today's decision, we would balance the security interest of the individual jail facility against the privacy interests of its arrestees. *See Kennedy*, 901 F.2d at 714 (concluding that the LAPD failed to provide sufficient documentation to justify its policy of strip searching every felony arrestee); *Giles*, 746 F.2d at 617 (holding the arrestees' privacy interests

outweighed Bonneville County Jail's security interests as the record demonstrated that smuggling activity at that local jail was minimal). Today's ruling adopts a dangerous per se rule notwithstanding the proven security needs of San Francisco County Jails. When people are dying as a result of our errant jurisprudence, it is time to correct the course of our law.

The contours of an arrestee's Fourth Amendment right when he or she is transferred into a jail's general population is debatable among reasonable jurists. Because there was no clearly established law on this issue, and because San Francisco provided a record sufficient to distinguish this case from our prior cases, I would hold that Sheriff Hennessey and his department lacked "fair warning" that San Francisco's policy violates the Fourth Amendment. We should reverse the district court's order denying qualified immunity to Sheriff Michael Hennessey.

I respectfully dissent.