**Mohamed Majed CHEHADE REFAI, Plaintiff,**

v.

**Peter LAZARO, City of North Las Vegas, City of North Las Vegas Police Department, Mark Paresi, and United States of America, Defendants.**

**No. 2:08–CV–01096–PMP–PAL.**

United States District Court, D. Nevada.

April 13, 2009.

1104

Charles D. Siegal, Kristina L. Wilson, Munger, Tolles & Olson LLP, Los Angeles, CA, Nira A. Geevargis, Philip Hwang, Lawyers Committee for Civil Rights of the San Francisco Bay, Rohit K. Singla, Trevor D. Dryer, Munger, Tolles & Olson LLP, San Francisco, CA, Peter L. Ashman, Law Offices of Peter L. Ashman, Las Vegas, NV, for Plaintiff.

Robert R. Edelman, United States Attorneys Office, Las Vegas, NV, Andrew Kim, J. Marcus Meeks, Washington, DC, Robert W. Freeman, Jr., Henderson, NV, for Defendants.

## ORDER

PHILIP M. PRO, District Judge.

Presently before the Court is Defendant Peter Lazaro's Motion to Dismiss (Doc. # 44), filed on December 8, 2008. Plaintiff filed an Opposition (Doc. # 58) on January 23, 2009. Defendant Peter Lazaro filed a Reply (Doc. # 62) on February 17, 2009.

Also before the Court is Defendant United States' Motion to Dismiss (Doc. # 45), filed on December 8, 2008. Plaintiff filed an Opposition (Doc. # 59) on January 23, 2009. Defendant United States filed a Reply (Doc. # 63) on February 17, 2009. The Court held a hearing on these matters on March 31, 2009.

## I. BACKGROUND

As alleged in the First Amended Complaint ("FAC"), Plaintiff Mohamed Majed Chehade Refai ("Chehade") is a sixty-three-year-old German citizen and resident. (First Am. Compl. ("FAC") ¶¶ 12, 26.) Chehade married a United States citizen, Joanne Mulligan ("Mulligan"), in 1976. (Id. ¶ 12.) The two have three children, all of whom are United States citizens. (Id.) Chehade has visited the United States almost every year since 1978 and has owned a home in Massachusetts for approximately thirty years. (Id.)

On December 28, 2006, Chehade arrived at McCarran International Airport in Las Vegas on a flight from Frankfurt, Germany. (Id. ¶ 21.) Chehade was entering the United States to visit his daughter, a California resident. (Id.) At the immigration counter, Customs and Border Patrol Officer William Jones ("Jones") spoke with Chehade and checked information on a computer. (Id. ¶ 22.) Jones then escorted Chehade to a room where Jones announced without explanation that Chehade was being denied entry into the United States. (Id.) Jones proceeded to question Chehade about his nationality, ancestry, and personal information, recording the answers on a Department of Justice "Record of Sworn Statement in Administrative Proceedings" and forcing Chehade to sign the document. (Id.) Jones thereafter told Chehade he either could voluntarily return to Germany on the 4:55 p.m. flight that day or await further investigation while in detention. (Id. ¶ 23.) Chehade opted to return to Germany. (Id.)

Defendant Peter Lazaro ("Lazaro"), a Department of Homeland Security ("DHS") Senior Special Agent of Investigation, then arrived to interrogate Chehade. (Id. ¶¶ 14, 24.) Some of Lazaro's questions "bordered on the bizarre," such as whether Chehade knew who killed former Lebanese Prime Minister Rafiq Al Hariri. (Id. ¶ 24.) Chehade answered the questions fully and truthfully but was not permitted to catch the 4:55 flight. (Id.) Thereafter, DHS agents transferred Chehade to the North Las Vegas Detention Center ("NLVDC"). (Id. ¶ 26.) En route, DHS agents handcuffed Chehade behind his back, causing him shoulder pain. (Id.) DHS agents also placed Chehade in the backseat of a car without buckling his seatbelt, thereby causing him to hit his head on the front seat at every stop. (Id.)

Upon arrival at NLVDC, jail officials placed Chehade in a cell overnight with twenty-five other inmates, including those charged with violent offenses. (Id. ¶ 27.) The cell had no heat, bed, or blankets, and Chehade passed the night on the floor without a jacket. (Id.) Chehade feared the humiliation of using the toilet in front of the other inmates and thus did not eat

until his transfer to another cell the next day. (*Id.*)

On December 29, Chehade was taken back to the airport for further questioning. (*Id.* ¶ 28.) He waited four to five hours but nobody came to question him. (*Id.*) At one point a female officer came into the room and shouted something similar to "You, Syrian, come here!" (*Id.*) Chehade was then returned to NLVDC, where he was placed in a four-man cell with at least one other inmate. (*Id.* ¶¶ 28, 36.)

After he arrived back at NLVDC, officers took Chehade and another inmate to a room where the officers told them to strip. (*Id.* ¶ 36.) The officers then told them to kneel down and cough, while the officers visually examined their anuses and genitals from the backside. (*Id.*) The officers asked Chehade to repeat the procedure, purportedly because Chehade did not expose himself to the officers' satisfaction the first time. (*Id.*)

On December 30, Lazaro and an unidentified woman questioned Chehade at NLVDC. (*Id.* ¶ 29.) They told Chehade they were the only ones who could help him but he had to cooperate. (*Id.*) They demanded that upon returning to Germany, he provide them with information on people with anti-American sentiments. (*Id.*) They informed him if he did not cooperate he would not be able to return to the United States. (*Id.*) Lazaro allegedly gave him a card with contact information and instructed Chehade to email him upon arrival in Germany. (*Id.*) Chehade understood these comments as demanding he spy for the United States if he wanted to return to see his daughter and grandchild. (*Id.*)

During his detention, DHS and NLVDC officials allegedly denied Chehade his heart medication for approximately thirty-six hours. (*Id.* ¶ 33.) Prior to Chehade's transport to NLVDC, Lazaro had been informed that Chehade suffered a massive heart attack two years prior, underwent multiple bypass surgeries, and took medication to prevent future problems. (*Id.*) However, upon arrival at NLVDC, jail officials took Chehade's heart medication along with his other possessions, refusing Chehade's request to keep the medication and claiming they would dispense their own medication to him. (*Id.*) On December 29, Chehade requested his medication but was refused. (*Id.* ¶ 34.) At around lunchtime that day, medics took Chehade's blood pressure, expressing concern over a dangerously high systolic pressure. (*Id.*) Chehade explained his heart conditions but did not receive any medication. (*Id.*) Chehade also experienced nosebleeds and an arrhythmic heartbeat. (*Id.*) Although a doctor allegedly was on call, Chehade was not aware of the doctor's presence nor permitted to see him or her. (*Id.* ¶ 35.) At approximately 9:30 a.m. on December 30, Chehade was given medication. (*Id.* ¶ 34.)

On December 31, DHS and NLVDC officials released Chehade from custody and returned him to the airport, without allowing him to change clothes or shave, and forcing him to appear in public in handcuffs. (*Id.* ¶ 30.) He was allowed to change clothes at the terminal before his flight back to Germany. (*Id.*) Shortly thereafter, a U.S. Customs and Border Protection spokesperson, Roxanne Hercules, told the press Chehade had been detained and excluded because of a criminal record or terrorism issue. (*Id.* ¶ 31.) No criminal charges were filed against Chehade concerning this incident and he has never been connected to terrorism. (*Id.*)

Subsequently, in the summer of 2007, two members of the Federal Bureau of Investigation's ("FBI") Joint Task Force in Boston, Special Agent John Crane and Massachusetts State Trooper Thomas Sar-

rouf ("Sarrouf"), approached Chehade's wife, Mulligan, at Boston's Logan International Airport and informed her the detention and exclusion of Chehade from the United States had been a mistake. (*Id.* ¶ 32.) They offered to assist in obtaining another U.S. visa for Chehade and gave her their business cards. (*Id.*) In early 2008, Sarrouf told Mulligan over the telephone that Chehade had been placed on a watch list incorrectly but his name had been removed after his detention. (*Id.*)

On March 18, 2008, Chehade filed an administrative claim with DHS. (*Id.* ¶ 10.) As of the initial date of this action, DHS had not decided Chehade's claim. (*Id.*) Chehade filed suit in this Court on August 20, 2008 against Lazaro in his individual capacity under *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics,* the City of North Las Vegas, the City of North Las Vegas Police Department ("NLVPD"), and NLVPD Chief of Police Mark Paresi ("Paresi") in his individual capacity. (Compl.(Doc.# 1) at 3–4.)

Chehade filed the FAC on October 7, 2008, adding the United States as a Defendant. (FAC ¶ 13.) Chehade brings nine causes of action: violation of the Fourth Amendment against Lazaro (count 1); violation of the Fifth Amendment against Lazaro (count 2); violation of the Fourteenth Amendment against North Las Vegas, NLVPD, and Paresi (count 3); intentional infliction of emotional distress against all Defendants except Lazaro (count 4); negligent infliction of emotional distress against all Defendants except Lazaro (count 5); assault against all Defendants except the United States and Lazaro (count 6); battery against all Defendants except the United States and Lazaro (count 7); negligence against all Defendants except Lazaro (count 8); and deprivation of civil rights through intimidation against the United States and Lazaro (count 9). (*Id.* at 11–

16.) Lazaro and the United States now move separately to dismiss.

## II. LEGAL STANDARD

When ruling on a motion to dismiss, the Court "must construe the complaint in the light most favorable to the plaintiff and must accept all well-pleaded factual allegations as true." *Siaperas v. Mont. State Comp. Ins. Fund,* 480 F.3d 1001, 1003 (9th Cir.2007) (quotation omitted). Although a plaintiff's factual allegations need not be detailed, a plaintiff must allege "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Dismissal is proper only if no cognizable legal theory exists or the plaintiff has alleged insufficient facts to support a cognizable legal theory. *Siaperas,* 480 F.3d at 1003. " 'The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.' " *Hydrick v. Hunter,* 500 F.3d 978, 985 (9th Cir.2007) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

## III. LAZARO'S MOTION TO DISMISS

As an initial matter, Chehade concedes the dismissal of count nine, as well as claims against Lazaro regarding Chehade's detention, the conditions of the confinement, use of excessive force, and efforts to enlist Chehade as a spy. As such, the remaining conduct on which counts one and two are based includes Lazaro's alleged involvement in strip searching and withholding medical care and medication from Chehade. Lazaro argues counts one and two should be dismissed on qualified immunity grounds.

"The doctrine of qualified immunity protects government officials from lia-

bility for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan,* —— U.S. ——, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009) (quotation omitted). Qualified immunity balances the need to hold public officials accountable for exercising power irresponsibly with the need to shield public officials from harassment, distraction, and liability when reasonably performing their duties. *Id.* Qualified immunity is "an immunity from suit rather than a mere defense to liability [and] it is effectively lost if a case is erroneously permitted to go to trial." *Id.* (quotation omitted).

■ The Court considers two prongs in resolving qualified immunity claims: (1) whether the plaintiff has alleged or shown a violation of a constitutional right and (2) whether the constitutional right was "clearly established" at the time of the alleged misconduct. *Id.* at 815–16. The Court in its discretion can decide which prong to address first. *Id.* at 818.

■ For a constitutional right to be "clearly established," "its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right at the time of his conduct." *Eng. v. Cooley,* 552 F.3d 1062, 1075 (9th Cir.2009) (quotations omitted). "In other words, in light of pre-existing law the unlawfulness must be apparent." *Wong v. United States (Wong I),* 373 F.3d 952, 976 (9th Cir.2004) (quotation omitted). The Court looks first to binding precedent of the United States Supreme Court and the United States Court of Appeals for the Ninth Circuit. *Boyd v. Benton County,* 374 F.3d 773, 781 (9th Cir.2004); *see also Hydrick,* 500 F.3d at 989 ("[I]f binding authority indicates that the disputed right existed, even if no case had specifically so declared, the Defendants would be on no-

tice of the right." (quotation omitted)). "In the absence of binding precedent, a court should look to whatever decisional law is available to ascertain whether the law is clearly established ..., including decisions of state courts, other circuits, and district courts." *Drummond ex rel. Drummond v. City of Anaheim,* 343 F.3d 1052, 1060 (9th Cir.2003) (alteration and quotations omitted); *see also Sorrels v. McKee,* 290 F.3d 965, 971 (9th Cir.2002) ("[U]npublished decisions of district courts may inform [a court's] qualified immunity analysis.").

## A. Clearly Established Constitutional Right in 2006

Lazaro argues the strip search did not violate a constitutional right because it occurred after Chehade had been outside of NLVDC in a public place and the FAC does not allege it was conducted in public, by officers of the opposite sex, or in an unprofessional manner. Lazaro also contends that even if the search violated the Constitution, the violation was not clearly established because such searches have a security justification after a detainee has been outside the facility in a public place.

Chehade responds that blanket strip search policies violate the Fourth Amendment when an individual has not been charged with a serious crime or is an immigrant detained by immigration authorities without reasonable suspicion of a serious crime. Chehade contends Lazaro could not reasonably have believed that his conduct did not violate Chehade's rights where Chehade was not charged with a crime, was denied entry for no apparent reason, and no evidence suggested he was concealing contraband or weapons.

■ Because Chehade never was admitted to the United States, he held the status of a non-admitted alien. Under the "entry

fiction," an alien seeking admission into the United States has not yet "entered" the country, even if the non-admitted alien is in fact physically present. *Wong I,* 373 F.3d at 971. Although the entry fiction denies all procedural rights to non-admitted aliens as to their admission applications, non-admitted aliens are entitled to at least some constitutional rights. *Id.* At issue here is the Fourth Amendment's prohibition on unreasonable searches.

 Searches occurring at the nation's border hold "a special place in Fourth Amendment jurisprudence pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country." *United States v. Gonzalez–Rincon,* 36 F.3d 859, 864 (9th Cir. 1994) (quotation omitted). At the border, the balance between the government's interest and the traveler's privacy rights is " 'struck more favorably to the Government.' " *Id.* (quoting *United States v. Montoya de Hernandez,* 473 U.S. 531, 539–40, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985)). Routine border searches "are not subject to any requirement of reasonable suspicion, probable cause or warrant" and are reasonable under the Fourth Amendment "by the single fact that the person or item in question has entered into our country from outside." *Id.* (quotations omitted). "Strip searches and body-cavity searches are of course considered nonroutine, and, unlike luggage searches and pat-downs, must be supported by reasonable suspicion." *Id.* However, once customs officials reasonably suspect an international traveler is smuggling contraband, they may detain and search her as necessary to verify or dispel the suspicion. *Id.*

Courts within the Ninth Circuit have analyzed scenarios where non-admitted aliens have been detained at local jails, holding that, at least as of 2006, a Fourth Amendment right to be free from nonroutine searches without reasonable suspicion is clearly established for non-admitted aliens. *See, e.g., Tungwarara v. United States,* 400 F.Supp.2d 1213 (N.D.Cal.2005); *Wong v. Beebe (Wong II),* No. 01–718–ST, 2007 WL 1170621 (D.Or. Apr. 10, 2007) (unpublished). In *Tungwarara,* a non-admitted alien was detained at a local jail facility where she underwent a non-invasive strip search consisting of a pat-down by a female officer in private. 400 F.Supp.2d at 1215, 1221. The Northern District of California held that "a non-invasive strip search of a non-admitted adult alien at the border without *any* suspicion of any kind is unconstitutional." *Id.* at 1222. However, the court concluded the unlawful nature of the search was not clearly established in 2002 because before the Ninth Circuit's 2004 *Wong I* decision, the extent to which non-admitted aliens enjoyed substantive constitutional rights was unsettled. *Id.* at 1220. Nevertheless, "[i]f the same search had occurred later after the Ninth Circuit's decision in *Wong* [*I* ], or had been more invasive or abusive at the time, the Plaintiff's 'clearly established' rights would likely have been violated." *Id.* at 1222.

In *Wong II,* the District of Oregon found Wong's search to be far more extensive than that in *Tungwarara* because, twice during her jail detention,[1] Wong was forced to strip and bend over for a visual inspection of her genital and anal area in an area separated from the public only by a thin curtain through which she could see male staff members. *Wong II,* 2007 WL 1170621, at *7, 15. The court noted Ninth Circuit precedent declaring strip searches

---

1. Wong was searched first after being transferred from one jail to another and then again after her transfer from the second jail back to the first. *Wong II,* 2007 WL 1170621, at *7.

without reasonable suspicion unconstitutional for persons arrested for minor offenses and illegal aliens at the border, as well as an Immigration and Naturalization Service ("INS") policy prohibiting blanket strip searches of persons in INS custody. *Id.* at *15 (citing *Giles v. Ackerman*, 746 F.2d 614 (9th Cir.1984) (per curiam), *overturned on other grounds by Hodgers–Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir.1999) (en banc); *Gonzalez–Rincon*, 36 F.3d 859). Therefore, "no INS official could have reasonably believed in June 1999 that without violating the Fourth Amendment, someone who presented no cause for suspicion of harboring contraband, who had not been charged with any crime, and who did not pose any risk of flight or danger, could be detained in a jail facility that conducted blanket strip searches." *Id.* at *16.

Nevertheless, Lazaro contends Chehade had no constitutional right to be free from a strip search upon returning to NLVDC from outside the facility. In *Bell v. Wolfish*, pretrial detainees [2] contested a policy under which all inmates underwent a visual inspection of body cavities as part of a strip search after every contact with a person from outside the facility. 441 U.S. 520, 523, 558, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). The Supreme Court concluded the searches were reasonable under the Fourth Amendment. *Id.* at 558, 99 S.Ct. 1861. The Court set forth a test to determine reasonableness:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights

that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Id.* at 559, 99 S.Ct. 1861. Although searches must be conducted in a reasonable manner, the Court concluded that, balancing the institution's security interests of preventing prisoners from obtaining contraband against the inmates' privacy interests, such searches can be conducted on less than probable cause. *Id.* at 560, 99 S.Ct. 1861; *see also Johannes v. Alameda County Sheriff's Dep't*, No. C 04–458MHP (PR), 2006 WL 2504400, at *12, 14 (N.D.Cal. Aug. 29, 2006) (unpublished) (finding strip searches of inmate constitutional after return from courthouse because he had been outside the jail before each search, which provided the opportunity to obtain contraband, even if guarded, such as from courthouse surfaces or floor), *aff'd*, 270 Fed.Appx. 605 (9th Cir.2008).

After *Bell*, the Ninth Circuit has held unconstitutional blanket strip search polices when applied to pre-arraignment arrestees charged with minor offenses. In Giles, the Court held unconstitutional a strip search occurring after the plaintiff was booked for minor traffic offenses. 746 F.2d at 618. The Court held "that arrestees charged with minor offenses may be subjected to a strip search only if jail officials possess a reasonable suspicion that the individual arrestee is carrying or concealing contraband." *Id.* at 617. "Reasonable suspicion may be based on such factors as the nature of the offense, the arrestee's appearance and conduct, and the

---

**2.** The prison facility housed mostly pretrial detainees but also housed convicted inmates awaiting sentencing or transportation, inmates serving relatively short sentences, convicted prisoners lodged there under writs of habeas corpus, witnesses in protective custody, and prisoners incarcerated for contempt. *Bell v. Wolfish*, 441 U.S. 520, 524, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

prior arrest record." *Id.; see also Way v. County of Ventura,* 445 F.3d 1157, 1162–63 (9th Cir.2006) (holding strip search with visual cavity inspection violated constitutional right, although not clearly established right, of arrestee upon booking of misdemeanor charge of being under the influence of drugs). *But see Thompson v. City of Los Angeles,* 885 F.2d 1439, 1442, 1447 (9th Cir.1989) (concluding offense of grand theft auto was "sufficiently associated with violence to justify a visual strip search" even though plaintiff was never charged); *Johannes,* 2006 WL 2504400, at *12 (distinguishing arrestee cases because plaintiff's entries into the jail were not spontaneous, there was no realistic expectation that his custody would be brief, and he had a lengthy and continuous incarceration history).

The Ninth Circuit recently held that a blanket policy of strip searching pre-trial detainees without reasonable suspicion solely because they were classified for housing in the general population violated the Fourth Amendment. *Bull v. City & County of San Francisco,* 539 F.3d 1193, 1202 (9th Cir.2008). However, the Ninth Circuit granted rehearing en banc in *Bull,*[3] presumably to determine, as the dissent in *Bull* states, whether "Ninth Circuit jurisprudence has deviated far off the course the Supreme Court … chartered" in *Bell. Id.* at 1212 (Tallman, J., dissenting); *Bull v. City & County of San Francisco,* 558 F.3d 887 (9th Cir.2009) (granting rehearing en banc); *see also Powell v. Barrett,* 541 F.3d 1298, 1300, 1310, 1314 (11th Cir. 2008) (en banc) (stating the Ninth Circuit incorrectly interpreted *Bell* in *Giles,* and

holding blanket strip search policy for detainees before booking into general population did not violate Fourth Amendment at least if search was no more intrusive than in *Bell* ).

Whether the jail constitutionally can perform a strip search pursuant to a blanket policy is not at issue here. Instead, the issue is whether federal agents can cause a strip search to occur at the border by placing a non-admitted alien in a jail facility they allegedly know has such a policy. As discussed above, it was clearly established at least by 2006 that strip searches of non-admitted aliens at the border, including those occurring during detention at a local jail facility, are constitutional only if supported by reasonable suspicion. Regardless of what reasonable suspicion NLVDC might have had to support a strip search after Chehade returned to NLVDC, federal officials at the border must have reasonable suspicion before strip searching a detainee. Thus, under pre-existing law, the unlawfulness of strip searching Chehade was apparent because, viewing the allegations in the light most favorable to Chehade, no reasonable suspicion existed to search him. Lazaro or other DHS officials could not bypass constitutional requirements by sending Chehade to NLVDC, where they allegedly knew strip searches occurred (FAC ¶ 36), under circumstances in which the DHS officials could not perform the strip search themselves. A reasonable official in Lazaro's position would know he could not strip search Chehade without reasonable suspicion, and he would know he could not place Chehade, who was under Lazaro's

3. The Ninth Circuit heard oral argument en banc in *Bull* on March 26, 2009. However, as of the date of this Order, the Ninth Circuit has not yet released an opinion. Additionally, the District of Oregon's decision in *Wong II* currently is pending before the Ninth Circuit, and the panel reviewing the case recently withdrew submission of the case pending the outcome of *Bull. Wong v. Beebe,* No. 07–35426 (9th Cir. Mar. 4, 2009). To the extent any subsequently issued decision in either *Bull* or *Wong II* affects the Court's decision in this case, the parties may move for reconsideration.

control, in a facility that would perform such a search. The Court therefore concludes count one of the FAC alleges a Fourth Amendment violation that was clearly established at the time of Chehade's strip search in 2006.

## B. Personal Participation in a Constitutional Violation

Lazaro argues the FAC fails to allege he was present at the strip-search or had a role in the decision to conduct the search, and merely speculates that he might be a "DHS official" who knew or should have known NLVDC officials would strip search Chehade. Further, Lazaro argues the FAC fails to allege Lazaro participated in the failure to give Chehade his medication because the FAC does not allege Lazaro knew Chehade was being denied medical care or that Lazaro had authority to require NLVDC officials to provide that care. Lazaro argues allegations that "DHS officials" prevented Chehade from taking his medication does not indicate Lazaro did so, and, nevertheless, the FAC indicates NLVDC officials, not Lazaro, prevented Chehade from taking his medication.

Chehade responds that he need allege only that Lazaro's actions led directly to a chain of events foreseeably resulting in a constitutional violation. Chehade argues the FAC alleges "DHS officials" knew or reasonably should have known Chehade would be subjected to an unlawful strip search at NLVDC, which had a blanket policy of conducting such searches. Further, Chehade argues the FAC alleges Lazaro was informed about Chehade's heart condition and "DHS officials" knew the medication was vital but that NLVDC had a blanket policy of seizing medication. Chehade contends Lazaro is included in "DHS officials" as he was in charge of the investigation, was personally involved in

the decision to detain Chehade, and could lengthen or shorten Chehade's confinement at NLVDC. Alternatively, Chehade requests leave to amend to clarify Lazaro was one of the DHS officials referenced in the allegations.

A plaintiff need not show direct, personal participation in an alleged constitutional violation to establish liability. *Wong I*, 373 F.3d at 966. Instead, the requisite causal connection can be established by the defendant "setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Id.* (quotation omitted). The critical question is whether it was reasonably foreseeable that the defendant's actions would lead to the alleged constitutional violation. *Id.*; *see also Tungwarara*, 400 F.Supp.2d at 1216–17 (concluding issue of material fact existed as to whether INS officer set in motion events foreseeably causing non-invasive strip search of non-admitted alien where INS officer falsified alien's sworn statements on which INS supervisor relied in part when detaining alien and INS officer knew detention of alien would be at local jail where strip searches routinely are performed); *Wong II*, 2007 WL 1170621, at *12–13 (concluding triable issue existed as to INS office director's role in strip search because, even though he had no contact with Wong, did not sign her removal order, and did not decide where to detain her, director participated in decision to issue order for Wong's expedited removal, was responsible for condition of detention facilities, chose not to use alternative facilities such as hotels, and should have known of jail's strip search policy).

In *Wong I*, Wong alleged INS officials violated her First and Fourth Amendment rights because they subjected her to detention conditions under which she was

denied vegetarian meals, strip searched, and denied access to her followers. 373 F.3d at 966. The Ninth Circuit stated Wong's complaint "fail[ed] to identify what role, if any, each individual defendant had in placing her in detention, much less whether any of the named INS officials knew or reasonably should have known of the detention conditions to which Wong would be subjected." *Id.* The Court held the complaint failed to identify how the individual INS officials' actions foreseeably could have caused the alleged constitutional violations. *Id.* at 967. However, the Court noted it was "possible that, upon identifying those officials responsible for placing her in detention and for overseeing detention conditions at the INS contract facility in question, Wong may be able to amend her complaint to properly allege constitutional violations *by those officials.*" *Id.*; *see also Robbins v. Oklahoma,* 519 F.3d 1242, 1250 (10th Cir.2008) ("[I]t is particularly important in such circumstances that the complaint make clear exactly *who* is alleged to have done *what* to *whom,* to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state.").

### 1. Strip Searches

Count one alleges Lazaro and Doe Defendants violated Chehade's Fourth Amendment rights. The FAC alleges "DHS officers" forced Chehade to spend four days and three nights in NLVDC. (FAC ¶ 25.) Although "NLVDC officials" allegedly conducted the strip searches, "DHS officials" "knew, or reasonably should have known, that [Chehade] would be subjected to unlawful strip and visual body-cavity searches" at NLVDC. (*Id.* ¶ 36.) The FAC defines "DHS officials" as "Lazaro and Does 1 through 25 or a subset thereof." (*Id.* ¶ 18.) As for Lazaro specifically, the FAC alleges he interrogated

Chehade at the airport and then "Lazaro and other Defendants" did not permit Chehade to catch the return 4:55 p.m. flight. (*Id.* ¶ 24.) The only other allegations specific to Lazaro are that he and an unidentified woman questioned Chehade on December 30 at NLVDC and that Lazaro was aware of Chehade's medical condition. (*Id.* ¶¶ 29, 33.)

Because Lazaro allegedly caused Chehade to miss his flight and, as one of the "DHS officials," forced Chehade to spend time at NLVDC where "DHS officials" knew he would be subject to a strip search, it is plausible Lazaro as a DHS official set in motion a series of acts he knew would cause Chehade to be strip searched. Because he is the only named "DHS official," Plaintiff likely intended Lazaro's inclusion in that group. However, because "DHS officials" includes Lazaro and Doe Defendants or a subset thereof, Lazaro theoretically might not be a "DHS official" for any particular allegation that uses the term "DHS officials." The Court therefore dismisses count one against Lazaro with leave to amend to clarify which actions Lazaro took and whether Lazaro knew Chehade would be subject to a strip search at NLVDC.

### 2. Denial of Medical Care and Medication

Chehade argues the denial of his heart medication violated his due process rights. Count two alleges a Fifth Amendment violation against Lazaro and Doe Defendants. The FAC alleges that before Chehade was brought to NLVDC, "Lazaro was informed that Mr. Chehade had suffered a massive heart attack two years prior, underwent multiple bypass surgeries which hospitalized him for weeks, and took medication to prevent future heart problems." (*Id.* ¶ 33.) The FAC also alleges "DHS ... officials ... prevented Mr. Chehade from taking his medication, including

medication for his heart condition, for roughly thirty-six hours while in their care, even though DHS officials ... knew that the medication was vital." (*Id.*) However, NLVDC officials or employees took Chehade's medication and refused him medicine or medical care. (*Id.* ¶¶ 33–35.)

Although the FAC alleges Lazaro was informed about Chehade's heart condition, the FAC alleges "DHS officials" denied Chehade medication without specifying whether Lazaro specifically did so. Further, the FAC makes only conclusory allegations that DHS officials prevented Chehade from taking his medication, without alleging how they did so. Instead, the FAC refers only to NLVDC officials' acts in denying Chehade medicine. The FAC therefore fails to allege Lazaro's personal involvement in these acts. Moreover, because the FAC does not allege Lazaro knew NLVDC officials would confiscate Chehade's medication, it cannot be inferred that Lazaro's knowledge of Chehade's heart condition set off a chain of events leading to the denial of medication. Because of these deficiencies, the Court dismisses count two against Lazaro with leave to amend.

## IV. UNITED STATES' MOTION TO DISMISS

Chehade concedes the dismissal of his negligent infliction of emotional distress (count 5) and civil rights (count 9) claims against the United States. The only remaining claims against the United States are for intentional infliction of emotional distress ("IIED") (count 4) and negligence (count 8). The United States argues the IIED claim should be dismissed for lack of subject matter jurisdiction, based on the discretionary function and government contractor exceptions, and for failure to state a claim. The United States argues

the negligence claim fails based on the discretionary function exception.

### A. Intentional Infliction of Emotional Distress

#### 1. Discretionary Function Exception

The United States argues Chehade's IIED claim (count 4) fails because the discretionary function exception covers law enforcement officers' decisions as to how to conduct an investigation and gather intelligence. The United States argues Lazaro is a special agent with Immigration and Customs Enforcement ("ICE") and thus is authorized to engage in a broad range of investigative activities. The United States also argues Lazaro, as a member of the FBI's Joint Terrorism Task Force, was authorized to request information from the public and identify potential assets.

Chehade responds that federal officials do not have discretion to violate the Constitution, arguing the spying request violates the Thirteenth Amendment. Chehade contends the United States does not demonstrate Lazaro had authority to force lawful visitors to become United States agents and law enforcement activities do not involve policy judgments. Alternatively, Chehade contends the documents offered by the United States should not be considered and, instead, he should be allowed discovery to determine Lazaro's authority to conscript people to spy, identify the woman who also interrogated Chehade, and ascertain the United States' and Lazaro's knowledge of NLVDC polices.

The United States replies that the spying request did not violate the Thirteenth Amendment because Chehade was not subjected to involuntary servitude within the United States and involuntary servitude does not exist when the individual has a choice. The United States contends federal officials did not have specific authority

to request that Chehade spy but, instead, had authority to obtain national security information and used discretion to request Chehade's help. The United States points out that even if federal officials abused their discretion, the exception still applies. Additionally, the United States contends investigations and intelligence gathering are susceptible to policy analysis. The United States argues discovery is unnecessary because the FAC fails to allege facts showing the challenged conduct is not grounded in the policy of the regulatory regime and, in any event, the United States showed the conduct was grounded in government policy.

 Under the Federal Tort Claims Act ("FTCA"), the United States waives sovereign immunity for those torts committed by federal employees acting in the scope of their employment. *Terbush v. United States*, 516 F.3d 1125, 1128 (9th Cir.2008). The United States can be sued " 'under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.' " *Id.* at 1128–29 (quoting 28 U.S.C. § 1346(b)(1)). However, certain exceptions exist, such as the "discretionary function exception," under which the United States is immune from " '[a]ny claim … based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.' " *Id.* at 1129 (alterations in original) (quoting 28 U.S.C. § 2680(a)).

 The Court considers a two-part test to determine if the discretionary function exception applies. *Id.* First, the Court considers whether the challenged actions involve an " 'element of judgment or choice.' " *Id.* (quoting *United States v.*

*Gaubert*, 499 U.S. 315, 322, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991)). "This inquiry looks at the 'nature of the conduct, rather than the status of the actor' and the discretionary element is not met where 'a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.' " *Id.* (quoting *Berkovitz v. United States*, 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988)). If a statute or policy mandating a specific action exists, the inquiry ends as no discretion exists when a federal employee must adhere to a directive. *Id.*

 Second, if a specific course of action is not prescribed, an element of choice or judgment likely is involved in the action. *Id.* The Court thus must consider " 'whether that judgment is of the kind the discretionary function exception was designed to shield,' namely 'only governmental actions and decisions based on considerations of public policy.' " *Id.* (quoting *Berkovitz*, 486 U.S. at 536–37, 108 S.Ct. 1954). Public policy includes those decisions "grounded in social, economic, or political policy." *Id.* (quotation omitted). " '[W]hen established governmental policy, as express or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion.' " *Id.* at 1130 (quoting *Gaubert*, 499 U.S. at 324, 111 S.Ct. 1267).

 The government bears the burden of proving that the discretionary function exception applies. *Id.* at 1128. However, "for a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be *grounded in* the policy of the regulatory regime." *Id.* at 1130 (quotation omitted); *see also Doe*

*v. See,* 557 F.3d 1066, 1084 (9th Cir.2009) (per curiam) ("[A] plaintiff must advance a claim that is facially outside the discretionary function exception in order to survive a motion to dismiss." (quotation omitted)).

 Here, the FAC alleges the United States asked "Chehade to spy for the United States government, and suggest[ed] that his ability to obtain an entry visa was conditioned upon his cooperation." (FAC ¶ 52.) The FAC states "the United States, through its policy, custom, and/or usage, induced and/or assisted Doe [Defendants] in performing the actions." (*Id.*)

Considering the discretionary prong, Chehade contends this conduct violates his Thirteenth Amendment right and thus the discretionary function exception cannot apply. *See Nurse v. United States,* 226 F.3d 996, 1002 n. 2 (9th Cir.2000) ("[T]he Constitution can limit the discretion of federal officials such that the FTCA's discretionary function exception will not apply."). The Supreme Court noted "it is possible that threatening ... an immigrant with deportation could constitute the threat of legal coercion that induces involuntary servitude." *United States v. Kozminski,* 487 U.S. 931, 948, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988). Nevertheless, no involuntary servitude occurred here because Chehade never spied for the United States. *See Brooks v. George County, Miss.,* 84 F.3d 157, 162 (5th Cir.1996) ("When the employee has a choice, even though it is a painful one, there is no involuntary servitude." (quotation omitted)). Thus, the United States did not violate the Thirteenth Amendment.

Further, the FAC does not allege the policy federal officials allegedly violated in requesting Chehade to spy. Chehade provides a handbook, field manual, and training workbook of immigration agencies to show Lazaro acted outside of his legal scope. (*See* Pl.'s Opp'n to Mot. to Dismiss (Doc. # 59), Ex. 1, Attachs. A–E.) However, these sources do not give specifics as to interrogations and do not include any mandates regarding requesting an alien to spy.

 The United States contends Lazaro and other federal officials have broad interrogation powers. *See, e.g.,* 19 U.S.C. § 1589a (stating customs officers may perform any law enforcement duty the Secretary designates); 8 C.F.R. § 287.5(a) ("Any immigration officer ... is hereby authorized ... to take and consider evidence ... concerning any matter which is material or relevant to the enforcement of the Act and the administration of the immigration and naturalization functions of [DHS]."); Exec. Order No. 12,333, 46 Fed. Reg. 59,941 (Dec. 4, 1981), *reprinted as amended in* 50 U.S.C. § 401 ("All reasonable and lawful means must be used to ensure that the United States will receive the best intelligence available."). According to Lazaro's affidavit,[4] he was part of the FBI's Joint Terrorism Task Force that was subject to Attorney General guidelines. (Def. United States' Mot. to Dismiss (Doc. # 45) ["Def. Mot."], Ex. 1 ¶¶ 4, 6.) The Attorney General guidelines provide broad authority to the FBI in interro-

4. Because the discretionary function exception affects the Court's subject matter jurisdiction, the Court can consider matters outside of the pleadings when resolving this issue. *See Gen. Dynamics Corp. v. United States,* 139 F.3d 1280, 1283 (9th Cir.1998) (Subject matter "[j]urisdiction does not exist when the claim is based upon the exercise or the failure to exercise or perform a discretionary function." (quotation omitted)); *McCarthy v. United States,* 850 F.2d 558, 560 (9th Cir.1988) ("[W]hen considering a motion to dismiss pursuant to Rule 12(b)(1) the district court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction.").

gations.[5] (Def. Mot., Ex. 2 at 12 (allowing FBI to "[i]nterview or request information from members of the public" in collecting information relating to national security threats).)

Chehade does not point to other authority specifically discussing requests to spy. This suggests the federal officials had discretion because Chehade points to no statute, regulation, or policy prescribing a specific course of conduct to follow in these circumstances. *See, e.g., Vickers v. United States*, 228 F.3d 944, 953 (9th Cir.2000) ("[A]lthough INS investigators undoubtedly enjoy discretion in the conduct of an investigation, this discretion does not extend to ... mandatory requirements proscribed by agency regulations as implemented by policy guidelines."); *Sabow v. United States*, 93 F.3d 1445, 1453 (9th Cir.1996) (holding investigators had discretion because manual did not contain mandatory terms and made clear officers were entitled to discretion).

Under the policy prong, when an agent has discretion, it is presumed that the agent's acts are grounded in policy. Further, acquiring a spy or using a line of questioning to attain national security information are grounded in political policy. *See, e.g., Sabow*, 93 F.3d at 1453 ("Investigations by federal law enforcement officials, particularly those involving the U.S. military, clearly require investigative officers to consider relevant political and social circumstances in making decisions about the nature and scope of a criminal investigation.").

▮ Therefore, because the FAC fails to allege that the United States' conduct in

interrogating Chehade is outside of the discretionary function, the discretionary function exception bars count four. However, the Court understands that obtaining official policies that specify a mandatory course of conduct for interrogations such as that which occurred here might involve some level of discovery. The Court therefore grants the United States' Motion to Dismiss as to count four but without prejudice so that Chehade can amend his Complaint promptly if and when he discovers a mandatory policy with which the United States failed to comply. As general discovery will proceed on Chehade's surviving claims, the Court also will allow discovery on the IIED claim for the limited issue of whether such a mandatory policy exists. Because the United States' alternative grounds for dismissal might cause the IIED claim to fail for other reasons, the Court also will consider the United States' other arguments as to count four.

*2. Government Contractor Exception*

Although the government's waiver of sovereign immunity under the FTCA covers actions of officers and employees of "'any federal agency,'" the FTCA expressly excludes liability for actions of "'contractor[s] with the United States.'" *Autery v. United States*, 424 F.3d 944, 956 (9th Cir.2005) (quoting 28 U.S.C. § 2671). The United States argues the IIED claim fails because its contract with NLVDC did not allow the United States to supervise the day-to-day operations of NLVDC employees and therefore the United States cannot be liable for the conduct of NLVDC employees. Chehade responds that he does not seek to hold the United States

---

**5.** The Attorney General guidelines also state that "the choice of [national security investigation] techniques is a matter of judgment" and the investigations authorized by the guidelines provide for "a variety of measures to deal with threats to the national security

... [that may include] recruitment of double agents." (Def. Mot., Ex. 2 at 2, 7.) These statements also show federal officials have discretion. Although the guidelines refer to double agents, using double agents is not mandatory.

liable for its contractors' conduct but instead for its employees' conduct. The Court thus concludes the government contractor exception does not apply.

### 3. Failure to State a Claim

The United States argues the FAC does not allege extreme and outrageous conduct because federal officials did not engage in any extreme abuse of their authority as their statements to Chehade about spying were aimed at achieving a legitimate law enforcement objective of enlisting Chehade in gathering foreign intelligence. The United States argues it could deny Chehade entry under the Visa Waiver Program ("VWP") and thus the "suggestion" that Chehade would not be allowed to return to the United States was not contrary to the United States' authority to decide which aliens to admit. The United States also contends that if the federal officials' spying statements qualify as extreme and outrageous, then many questioning techniques would subject law enforcement officers to IIED claims. Finally, the United States notes the FAC does not allege that federal officials intended to cause Chehade emotional distress.

Chehade responds that the United States' employees' conduct was extreme and outrageous because they abused their authority by denying Chehade entry for no reason and attempting to coerce him into spying at a time when he was particularly susceptible to emotional distress, after a strip search and denial of medication. Chehade also argues the United States' conduct was unlawful and thus outrageous because immigration inspectors could refuse Chehade entry to the United States under the VWP only for specified reasons, none of which applied to Chehade. Further, Chehade notes the United States does not argue other actions, such as strip searches, deprivation of medication, and rough treatment en route to NLVDC, do not constitute extreme and outrageous

conduct. Finally, Chehade notes the FAC alleges Defendants acted with the requisite intent.

The United States replies that the FAC indicates the IIED claim against the United States relates only to the request to spy. Nevertheless, the United States argues an IIED claim based on the decision to house Chehade at NLVDC fails because federal officials did not decide to strip search or deny medication to Chehade, and they did not intend to cause Chehade emotional distress. The United States also argues the car ride from the airport to NLVDC cannot constitute an IIED claim because that is not alleged as an IIED claim in the FAC and the allegations are not extreme and outrageous.

■■■ Under Nevada law, IIED requires three elements: "(1) extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress, (2) the plaintiff's having suffered severe or extreme emotional distress and (3) actual or proximate causation." *Dillard Dep't Stores, Inc. v. Beckwith,* 115 Nev. 372, 989 P.2d 882, 886 (1999) (en banc). The Court determines whether the defendant's conduct may be regarded as extreme and outrageous so as to permit recovery, but, where reasonable people may differ, the jury determines whether the conduct was extreme and outrageous enough to result in liability. *Norman v. Gen. Motors Corp.,* 628 F.Supp. 702, 704–05 (D.Nev.1986) (considering "totality of the circumstances" in determining whether conduct is extreme and outrageous); Restatement (Second) of Torts § 46 cmt. h. "[E]xtreme and outrageous conduct is that which is outside all possible bounds of decency and is regarded as utterly intolerable in a civilized community." *Maduike v. Agency Rent-A-Car,* 114 Nev. 1, 953 P.2d 24, 26 (1998) (per curiam) (quotation omitted). However, "persons must necessarily be expected and required


**1122**

to be hardened to occasional acts that are definitely inconsiderate and unkind." *Id.* (omission and quotation omitted); *see also* Restatement (Second) of Torts § 46 cmt. d ("The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.").

The Nevada Supreme Court has referred to the Restatement (Second) of Torts § 46 as relevant authority for IIED claims under Nevada law. *See, e.g., Olivero v. Lowe,* 116 Nev. 395, 995 P.2d 1023, 1027 (2000); *Selsnick v. Horton,* 96 Nev. 944, 620 P.2d 1256, 1257 (1980). The Restatement states that extreme and outrageous conduct may arise "from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity." Restatement (Second) of Torts § 46 cmt. f. "[H]owever, ... major outrage is essential to the tort; and the mere fact that the actor knows that the other will regard the conduct as insulting, or will have his feelings hurt, is not enough." *Id.* Extreme and outrageous conduct also "may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests." [6] *Id.* cmt. e (stating police officers have been held liable for "extreme abuse of their position").

Nevada has not addressed an analogous factual scenario to the present case. How-ever, in a case factually similar to this one, the District of Connecticut found that the plaintiff alleged an IIED claim under Connecticut law. *El Badrawi v. Dep't of Homeland Sec.,* 579 F.Supp.2d 249, 279 (D.Conn.2008). In *El Badrawi,* ICE agents arrested El Badrawi on suspected immigration violations, even though he allegedly was lawfully in the United States, and transported him to a state correctional facility, where he was strip searched and placed into the general population. *Id.* at 252, 254. Although ICE agents took El Badrawi's Crohn's disease medicine from his residence, the medicine was not transported to the correctional facility nor was it given to him for seven days. *Id.* at 254. El Badrawi agreed to leave the United States after he was subjected to confinement, but he remained at the detention facility for another forty-two days. *Id.* at 254–55. The court held El Badrawi alleged extreme and outrageous conduct as to his initial arrest and detention because ICE agents "arrested El Badrawi and took him into custody alongside a general prison population, even though they knew or should have known that he had committed no immigration violation." *Id.* at 279. The court also held El Badrawi stated an IIED claim based on the post-voluntary-departure detention as this conduct could be found to shock the conscience. *Id.*[7]

Here, the FAC alleges that "[b]y asking Mr. Chehade to spy for the United

---

**6.** The parties dispute whether Nevada law, like Nebraska law, requires a showing of an improper purpose in an IIED claim based on a threat by a law enforcement officer. *See Cole v. United States,* 874 F.Supp. 1011, 1045 (D.Neb.1995) ("[F]or a police officer's improper threat to be actionable, the action must normally involve some plainly improper motive, such as extortion."). Although an improper motive would add additional support to this conduct being extreme and outrageous, the Court cannot conclude that the Nevada Supreme Court, which has tended to rely on the Restatement, necessarily would require an improper motive.

**7.** *See also Ramirez v. City of Reno,* 925 F.Supp. 681, 687, 690 (D.Nev.1996) (concluding defendants were not entitled to summary judgment on IIED claim where defendant police officers pushed plaintiff face first into a puddle, effectively drowning him, dragged him face down through loose gravel, and knew at the time he was not involved in knife attack and was physically and mentally disabled); *Reindl v. City of Leavenworth, Kan.,*

States government, and suggesting that his ability to obtain an entry visa was conditioned upon his cooperation, the United States engaged in extreme and outrageous conduct." (FAC ¶ 52.) The request to have Chehade spy, although perhaps odd or even offensive, is not outside all possible bounds of decency during an interrogation at the border. However, Lazaro and the unidentified woman also told Chehade if he did not cooperate he would never be able to return to the United States where his daughter and grandchild live. Further, the FAC alleges that Lazaro and the woman stated they were the "only ones who could help [Chehade]" but first he needed to cooperate. (*Id.* ¶ 29.) Lazaro and the unidentified woman had authority over Chehade with the power to affect Chehade's ability to return to Germany. Given their control over Chehade's movements, their alleged knowledge of his heart condition, and that he would be subjected to a strip search, a reasonable jury could find the federal officials knew Chehade was peculiarly susceptible to emotional distress.

Nevada has not considered similar circumstances in the context of an IIED claim, but at least one other federal district court has found a potentially viable IIED claim under similar facts. The Court concludes reasonable minds could differ over whether the federal officials' conduct under the totality of the circumstances in this case was extreme and outrageous and therefore the question is one for the fact finder.[8] Count four therefore states a claim upon which relief may be granted.[9] Accordingly, the Court will dismiss count four on discretionary function exception grounds, as stated above, with leave to amend if and when Chehade discovers a mandatory policy following the thirty-day discovery period.

## B. Negligence

■■■ The United States argues Chehade's negligence claim (count 8) fails un-

443 F.Supp.2d 1222, 1227, 1233–34 (D.Kan. 2006) (granting summary judgment on plaintiff's mother's IIED claim in favor of police officer for officer's rude comments to plaintiff at hospital and in mother's presence that plaintiff was "going to jail" but denying summary judgment for plaintiff's IIED claim for officer's actions in beating plaintiff's leg with a baton during arrest and later comments at hospital). *But see Rondelli v. Pima County*, 120 Ariz. 483, 586 P.2d 1295, 1302 (Ariz.Ct. App.1978) (affirming summary judgment in favor of defendant police officers because stereotyping plaintiff as "Mafiosi," detaining him for an hour without explanation, searching and handcuffing him in public, treating him as a dangerous criminal for failing to file a tax return, and falsely arresting him was not extreme and outrageous conduct); *Keates v. City of Vancouver*, 73 Wash.App. 257, 869 P.2d 88, 92 (1994) (affirming summary judgment for investigator because conduct was not outside all possible bounds of decency where police officer was lawfully engaged in murder investigation of which plaintiff was suspect, officer was not aware plaintiff was particularly susceptible to emotional distress, plaintiff knew he could terminate the interview at any time, no physical contact took place, and, although officer yelled at plaintiff, it did not rise to the level of outrage).

8. The parties also dispute intent. The FAC alleges Defendants "engaged in the above acts and/or omissions with either the intention of, or reckless disregard for, causing Mr. Chehade physical injury and severe or extreme emotional distress." (FAC ¶ 53.) As such, the FAC alleges the requisite intent.

9. The parties dispute whether the FAC also alleges IIED against the United States based on strip searches, deprivation of medication, and rough treatment en route to NLVDC. Although a fair reading of the FAC suggests it asserts an IIED claim against the United States only with respect to the request to spy, viewing the FAC in the light most favorable to Chehade, a jury may consider the totality of the circumstances to determine whether the United States' conduct is extreme and outrageous enough to warrant liability.

der the discretionary function exception because DHS has discretion to contract with local facilities to house aliens. Chehade responds that the exception does not apply where federal officials knew or should have known that by sending Chehade to NLVDC, he would be subjected to strip searches and denial of medication in violation of the Fourth and Fifth Amendments. The United States replies that the negligent conduct of housing Chehade at NLVDC is not unconstitutional and therefore can be barred by the exception.

The negligence claim states that "[t]he United States owed Mr. Chehade a duty of care not to cause him to be detained in the NLVDC, when Mr. Chehade had not been and was never charged with any criminal offense." (FAC ¶ 68.) As to the discretionary prong, the FAC alleges that an INS memorandum states non-criminal aliens "should NOT be booked into any jail facility absent extraordinary circumstances."[10] (*Id.* ¶ 25.) Although some discretion perhaps exists in determining when extraordinary circumstances exist,

this provides a legal mandate to which immigration officials must comply. Further, considering the allegations in the light most favorable to Chehade, no extraordinary circumstances existed because Chehade was willing to return to Germany, he was not charged with a crime, and he never had been connected with terrorism. (*Id.* ¶¶ 23, 31.) Thus, under the INS memorandum, Chehade should not have been booked into NLVDC.[11]

However, the United States points to authority that it claims shows it had discretion as to where to place Chehade. For example, the Attorney General is authorized, "in support of persons in administrative detention in non-Federal institutions . . . to make payments . . . for necessary clothing, medical care, necessary guard hire, and the housing, care, and security of persons detained by the Service pursuant to Federal law under an agreement with a State . . . ." 8 U.S.C. § 1103(a)(11). The United States also points to an affidavit in which Frank Galvan, an assistant field offi-

---

10. The United States provides the purported memorandum, an affidavit stating the memorandum was superseded, and the alleged superseding memorandum. (*See* Def. Mot., Ex. 3 ¶ 18.) The original memorandum ("Memo 1") as provided by the United States is dated September 29, 2000 and is titled "Policy–Overnight Detention for Airport Refusals." (*Id.,* Attach. B.) The alleged superseding memorandum ("Memo 2") is dated October 18, 2004 and states it "supersedes all outstanding guidance regarding priorities for the detention of aliens within Border Transportation Security." (*Id.,* Attach. C.) Memo 2 provides priority categories of aliens subject to detention, as well as documentary requirements. (*Id.*) Memo 2 also states mandatory detention guidelines must be adhered to strictly, but in all other cases, the Detention and Removal Operations Director "retains the discretionary authority with respect to allocation of bed space and other detention-related resources." (*Id.*) Because Memo 2 states it supersedes guidance as to priorities for detaining aliens, it does not necessarily super-

sede guidance as to the circumstances under which federal officials can house noncriminal aliens overnight. Although further discovery might demonstrate that Memo 2 does in fact supersede Memo 1, the Court cannot conclude at this point in the litigation that Memo 1's statement pertaining to non-criminal aliens no longer applies.

11. Chehade also argues the United States violated a legal mandate under the Fourth and Fifth Amendments by placing him in NLVDC where he was strip searched and denied medication. Because it is not clear under the FAC whether the United States or its employees violated the Constitution, these issues will be fleshed out through discovery. *See Nurse,* 226 F.3d at 1002 (reversing dismissal of claims "because the alleged decisions of the policy-making defendants may have been nondiscretionary" and whether defendants' conduct violated specific constitutional mandates would "be fleshed out by the facts as this case proceed[ed] toward trial").

cer for immigration agencies, states that the U.S. Marshals have an intergovernmental service agreement with NLVDC for NLVDC to provide detention services for adult aliens. (Def. Mot., Ex. 3 ¶¶ 8–9, 14.) Under the agreement, NLVDC must follow certain requirements, such as twenty-four-hour supervision and emergency medical care. (*Id.* ¶ 10.) The Office of Detention and Removal Operations "has discretionary authority to make detention decisions." (*Id.* ¶ 19.) According to these documents, immigration officials appear to have some discretion in choosing where to house aliens.

 Nevertheless, the INS memorandum alleged by Chehade mandates an action for immigration officials to follow under the circumstances alleged in this case. Although discovery may show the INS memorandum no longer is in effect or uncover other authorities that demonstrate federal officials' discretion in this case, the Court will not apply the discretionary function exception to the negligence claim at this point in the litigation.[12]

## V. CONCLUSION

IT IS THEREFORE ORDERED that Defendant Peter Lazaro's Motion to Dismiss (Doc. # 44) is hereby GRANTED. Counts one and two are dismissed without prejudice. Count nine against Lazaro as well as claims against Lazaro regarding Chehade's detention, the conditions of the confinement, use of excessive force, and efforts to enlist Chehade as a spy are dismissed with prejudice.

IT IS FURTHER ORDERED that Defendant United States' Motion to Dismiss (Doc. # 45) is hereby GRANTED in part and DENIED in part. Counts five and nine are dismissed against the United States with prejudice. Count four against the United States is dismissed without prejudice. The Motion is denied in all other respects.

---

12. The United States also notes the negligence claim fails because Chehade cannot show the United States owed him a duty to not house him at NLVDC. The United States argues Chehade cannot look to federal law for a duty of care and, in any event, the duty Chehade cites has been superseded by new DHS guidance permitting detaining non-criminal aliens in local jails. Chehade responds that he seeks to hold the United States liable under Nevada law. Under Nevada law, "state officials have a duty to exercise ordinary care in performing their duties." *Butler ex rel. Biller v. Bayer*, 123 Nev. 450, 168 P.3d 1055, 1065 (Nev.2007) (en banc). At a minimum, government officials have "a duty to exercise reasonable care to avoid foreseeable harm" to inmates. *Id.* Chehade therefore points to a state law duty on which to base his negligence claim.